**Robert DANIELS, Plaintiff,**

v.

**ESSEX GROUP, INC., Defendant.**

**Civ. No. F89–38.**

United States District Court,
N.D. Indiana,
Fort Wayne Division.

June 27, 1990.

Steven L. Jackson, Miller, Grotrian, Stewart & Jackson, Fort Wayne, Ind., for plaintiff.

Herbert C. Snyder, Jr., Barnes & Thornburg, Fort Wayne, Ind., for defendant.

## MEMORANDUM DECISION AND ORDER

WILLIAM C. LEE, District Judge.

This matter is before the court for a decision on the merits following a bench trial. Having examined the entire record and having determined the credibility of witnesses; after viewing their demeanor and considering their interests, this court enters the following Findings of Fact and Conclusions of Law pursuant to Fed.R. Civ.P. 52(a).

## FINDINGS OF FACT

Robert Daniels is an African–American male. He was born January 13, 1954. He was hired by Essex Group, Inc. on August 28, 1978 as an hourly employee and worked for Essex until his resignation in April, 1988. Essex Group, Inc. is a corporation licensed and authorized to do business in the State of Indiana with its manufacturing facilities located in Columbia City, Indiana.

Daniels was employed as a product worker in the Concast Department at Essex' plant in Columbia City, Indiana. In the spring of 1987, Daniels was the only racial minority employed in the Concast Department at Essex' Columbia City facility. He was also the only person on his shift and in his department who went by the name "Bob". Essex considered Daniels to be a good employee and had no complaints about the quantity or quality of his work until the latter part of 1987. Beginning in December, 1987, Daniels began experiencing absenteeism problems which Essex responded to by issuing notices to Daniels regarding the need for improvement of his attendance. In April, 1988, Daniels resigned from his employment with Essex after being told that his continued absenteeism would lead to termination of his employment. Daniels' rate of pay in April, 1988 was $8.69 per hour.

Prior to Daniels' resignation, several incidents of racial[1] harassment occurred which led Daniels to state that he "can't take it!!" as his reason for quitting. The sequence of the events and exactly when the events occurred remains unclear; however, sometime around Halloween in 1987, Daniels came to work in the morning and saw a full size dummy with a black head hanging about 100 to 150 years from his department. The dummy was dressed in white overalls and had red "blood" on it and was visible from an aisleway which Daniels normally had to walk down to get from the time clock to his work station. Daniels reported the incident to his supervisor, Mike Rohrer, and asked him to do something about it. Rohrer told Daniels not to get excited and that he would take care of it. When Daniels left work at 3:00 P.M. the dummy was still there. When Daniels returned to work the next morning at 3:00 A.M. the dummy was still there. Daniels testified that he felt that the dummy was meant to express violence against black employees at Essex; especially against him since he was the only black employee on his shift or in his department.

There were also incidents of racially threatening slogans written on the bathroom walls in Daniels' department on three or four occasions beginning in January, 1988. The specific slogan Daniels recalled was "KKK all niggers must die." Vicki Churchward, personnel manager at Essex, also testified that "KKK" was written on the bathroom walls and Rohrer recalled painting over "KKK forever." Daniels reported the incidents to Rohrer who again told Daniels not to get excited. Each time the slogans appeared in the bathroom[2], they were painted over, but nothing was

---

1. Although defendant presented the testimony of Michael Rohrer, Daniels' supervisor at Essex, who denied that the scale house incident occurred and felt that the dummy incident was not racially motivated, this court believes the plaintiff's version of the facts regarding these incidents. The evidence, which included pictures of the scale house with the words "hi Bob KKK" written on the scale house wall, as well as the demeanor and interests of the witnesses testifying support this conclusion. Furthermore, Rohrer's testimony regarding the color of the face on the dummy hung in effigy reflected a lack of knowledge as to the color of the dummy rather than an honest recollection that the dummy was not black. Additionally, although Rohrer testified that Daniels never reported the scale house incident, he did not deny that he repeatedly told Daniels not to worry or get excited about the racial incidents. Furthermore, throughout Rohrer's sworn testimony, he never stated that he ever talked to any other employees at Essex regarding the company's intolerance of discrimination.

2. Defendant contends that the racist bathroom writing occurred only once and that Rohrer painted over it as soon as was possible. However, Rohrer testified that the bathroom walls were constantly being painted over because there was always some graffiti reappearing on them. Rohrer also testified that he could not recall all the slogans written on the bathroom walls over the years. This court, therefore, believes that there were several incidents of racial slurs written on the bathroom walls as Daniels testified.

ever done to discourage further incidents despite the repetitive nature of their occurrences [3].

Another racial incident involved the words "hi Bob KKK" written on the scale house [4] wall. Daniels considered the writing to be a racially threatening comment because of the reference to the Ku Klux Klan. Daniels reported the incident to Rohrer five or six months before the dummy and bathroom graffiti incidents occurred. Rohrer told Daniels not to worry about it. Although it is not clear exactly when the writing on the scale house wall first appeared, it was still there after Daniels reported it to Rohrer and still there at the time of Daniels' resignation [5]. Thomas Daniels, the plaintiff's brother, testified that, when he was told of the writing on the scale house wall, he suggested that he and his brother go to the Essex plant in Columbia City. Once there, Thomas took pictures of the scale house, outside and inside. The pictures were admitted into evidence and plaintiff's exhibit # 2 clearly depicts the words "hi Bob KKK". The words were written on the inside back wall of the scale house facing the door. Thomas testified that the pictures were taken at the Columbia City plant on a Monday in May, a week or two after his brother's resignation [6].

Daniels testified that after reporting the foregoing incidents to Rohrer he was told that a meeting was held with the employees and they were warned that the company would not tolerate racial incidents, but the evidence makes it clear that no such meeting of the workforce ever took place and no written warning was ever issued to the workforce prior to Daniels' resignation. Daniels was never invited to attend any meetings where discrimination in the workplace was discussed and he never saw a written warning regarding company intolerance of racial harassment or heard any fellow employees mention such a warning or notice. Churchward also testified that no written memo was ever issued to the general workforce regarding intolerance of racial harassment and no admonitions or warnings regarding discrimination were issued to any employees. She did testify that a joint resolution was entered into by the company and the union which de-

**3.** Daniels did testify, however, that he overheard one conversation Rohrer had with two employees during which Rohrer warned the two that writing on the bathroom walls would cause them "to be written up." Rohrer never testified regarding this warning and the circumstances under which Rohrer made the statement are unknown. In light of the overwhelming evidence of no reasonable response to prevent recurrence of the racial harassment, this court finds that this one admonition by Rohrer was not aimed at the racial nature of the graffiti, but rather at the added work required in painting over graffiti in general.

**4.** The scale house is a small shed-type building located outdoors where tools and other such items are kept. As part of Daniels' job, he was required to go to the scale house on occasion.

**5.** Rohrer testified that he did not recall Daniels ever reporting the scale house writing to him; however, again this court finds Daniels' version of the facts to be more credible than the defendant's since Rohrer talked with all of his employees daily and had difficulty remembering when things occurred and could easily have completely forgotten incidents which he found to be insignificant as a white supervisor.

**6.** Defendant's version of the facts regarding the scale house incident is that it never occurred.

Rohrer testified that Daniels never talked to him about any words on the scale house wall and that he never saw the specific words depicted in plaintiff's exhibit # 2. Rohrer also testified that he painted the scale house blue at the same time that the bathroom slogans were painted over, sometime when the weather was warm but he was uncertain as to what year he did the painting. Churchward testified that she examined the scale house in 1988 several months after Daniels quit and had filed his EEOC charges and that she found the interior walls to be blue with no writing on them. Contrary to the testimony of Rohrer and Churchward, plaintiff's exhibit # 2 depicts the scale house wall to be a rust color with the words clearly visible. In order to believe defendant's version of the facts regarding the scale house, this court would have to find that the plaintiff had his brother go elsewhere and fabricate the writing for the purpose of taking the picture and then find that the plaintiff and his brother both falsely testified regarding the events surrounding the picture taking. Based on the demeanor of the witnesses as they testified and their attention to detail, this court finds that the plaintiff and his brother testified credibly regarding the scale house incident and the facts surrounding the picture taking.

nounced discrimination by the company and the union in response to a complaint of harassment by an employee other than Daniels [7].

There were other incidents which occurred during this same period of time, from late 1987 until Daniels' resignation in April, 1988. One incident involved a fellow employee named Art who approached Daniels at work and called him names including "nigger" and threatened to whip him and "take him out on 30" and beat him [8]. He also threatened Daniels' four year old son. Essex personnel brought both men together to discuss the problem and they left the meeting stating that everything was alright; however, Daniels testified that Art continued to call him racist names after the meeting. Another incident occurred at Daniels home about three or four weeks before he quit. Daniels testified that at approximately 2:30 A.M. he heard a noise on his porch but did not think much about it. He later got up and left for work. When he returned, he found paint chips

and debris on the floor and saw a hole in the ceiling. There was a bullet lodged in the wall near a window which had come through the woodwork on the porch and ricocheted off the ceiling. He thought it might have been someone from work but he had no evidence.

Two or three weeks before he quit, Daniels met with Churchward and told her that he was getting tired of the harassment and racial jokes and that he could not work there while "looking over his shoulder". Churchward responded to Daniels' complaints by stating that she hated to see him go and suggesting that he transfer to a different department at Essex [9]. On April 15, 1988, Daniels had another conversation with Churchward in which he told her that he was sick and had lost a lot of weight and needed to see a doctor. After Churchward explained the company's attendance policy, Daniels told her that he would call her after his upcoming doctor's appointment. Although Daniels did see a doctor, he failed to call Churchward after his doc-

---

7. Defendant submitted exhibit F which was a memo to all plant employees regarding a joint effort against discrimination by the company and union. The memo stated that:

1. All reported incidents will be followed upon immediately, with both the department Supervisor and Steward talking to the offended employee, and then to the alleged offender, to establish what took place, if there were witnesses, etc.
2. In all instances, even those without witnesses, the alleged offender will be spoken to by both his or her Supervisor and Steward as to discrimination charges, and that any such actions are not acceptable or tolerated in the workplace.
3. When an incident can be documented/substantiated thru [sic] witnesses or other means, disciplinary action will be taken by the Company, per Shop Rule # 15, using written warning up to and including discharge. The Union will not support or protect documented offenders who have knowingly discriminated against their fellow workers.

The memo was dated March 16, 1988; however, it was not signed by the union representative until March 31, 1988, about three weeks before Daniels quit. Defendant presented testimony that the memo was given to each employee with his paycheck about two weeks later. Daniels testified; however, that he never received a copy of the memo with any of his paychecks.

Even if this court accepted defendant's contention that the memo was issued with pay-

checks in response to Daniels' complaints, the memo could not have been issued until well after the events complained of and was not specifically aimed at the racial discrimination in the Concast department. Furthermore, the memo was a completely ineffective response to the racially discriminatory incidents by the very nature of its generic message and distribution.

8. This is clearly a reference to U.S. 30, the main highway which runs between Fort Wayne, Indiana (where Daniels lives) and Columbia City where the Essex plant is located.

9. Churchward admitted that she had this conversation with Daniels several weeks before he quit but she denied that he made any reference to racial harassment or the incidents regarding the dummy and the bathroom wall. Churchward testified that she did suggest to Daniels that he transfer out of the department and that Daniels responded that he only wanted to work in that (the Concast) department. This court believes that Daniels told Churchward about the racial harassment during their conversation because it is inconceivable that Churchward would recommend a transfer to another department as a solution to Daniels' complaints if he had not mentioned the specific racial problems in the Concast department. If he was merely tired of working at Essex, a transfer would not have made a difference nor would Daniels have stated his desire to only work in the Concast department.

tor's appointment and received a letter dated April 19, 1988, which set up a meeting between Daniels, Churchward and Rohrer. On April 25, 1988, Daniels met with Churchward and Rohrer and told them that he quit. He had never quit a job before. He quit because continuing his employment at Essex in Columbia City had become a threat to him and to his family.

In addition to the foregoing specific incidents there was evidence of general racial prejudice which permeated the Essex plant in Columbia City. James Alexander, an African–American male and Senior Quality Control Technician at Essex Wire in Fort Wayne, Indiana, testified that in late spring or early summer of 1987 he sought a position at the Columbia City plant. He interviewed for the position at the Fort Wayne facility with Mike O'Connor. Alexander testified that he was told by O'Connor that it would be hard for him in Columbia City because there were older workers there who were "extremely prejudiced". Alexander had interviewed for many positions at other Essex facilities around the country and had never been told that any other plants had employees who were "extremely prejudiced". Alexander told O'Connor that he did not have a problem with prejudice as long as he had the backing of management. O'Connor never told Alexander that he would have the backing of management. Alexander never got the job in Columbia City; the position was given to a white man. Alexander never received the usual documentation showing that the position had been filled. He simply never heard anything about the job again and eventually filed charges with the EEOC concerning the failure to hire him at Columbia City. The EEOC determined that there was insufficient evidence to merit a claim. Alexander felt satisfied with the EEOC determination to the extent that there was insufficient evidence, but he did not feel the EEOC determination was necessarily true regarding the merit of his charge of discrimination.

Furthermore, when Rohrer painted the scale house there were some slogans he admitted seeing on the wall which indicate the general racial animosity at the Columbia City facility. The words "Reinaldo Gonzalez" were on the wall and Rohrer explained that that was a teasing reference to an employee named Randy Heron who "looked kind of like a Mexican". There were also the words "your momma". Rohrer also testified that he painted the bathroom walls quite often because of similar graffiti which appeared there even though he could not recall any of the specific messages written on the walls. However, despite the company's knowledge of the repeated incidents of racial slogans, there was no evidence that anyone on behalf of Essex ever tried to find out who was doing these things. There was also never an investigation of any of the incidents involving reference to the KKK or who hung the dummy.

Daniels testified that until 1987 he liked working at Essex in Columbia City. He also testified that there were racial incidents prior to the Fall of 1987 which included telling "nigger" jokes, teasing him regarding talking to white women and interracial dating and being called "Buckwheat". Daniels testified that there was some racial incident every day and he asked his fellow workers to knock it off with no success. He also testified that he asked supervisors to talk to the guys and tell them to knock it off but it had no effect. However, the atmosphere was not bad enough to cause Daniels to want to quit until the end of 1987 when the nature of the acts of racism changed.

At that time Daniels' ability to perform his job and get along with his fellow employees drastically changed. For the entire time Daniels worked in Columbia City prior to the fall of 1987, Daniels' work performance was very satisfactory and he had a good attendance record. He also socialized with many of his co-workers away from the plant; going hunting and fishing, drinking beer together, attending weddings for each other and going to each others' homes. After the incidents of racism which involved references to the KKK; however, Daniels felt threatened and began having trouble going to work. He experienced a bad absenteeism problem beginning in De-

cember, 1987 which led to oral and written warnings by Essex personnel and continued until he resigned in April, 1988. He also began experiencing hostility with his co-workers whom he had previously enjoyed being around. He argued a lot with his co-workers and began telling others how to do their jobs. Daniels lost a considerable amount of weight during this period of time and became ill quite often. The evidence clearly showed that everyone who had contact with Daniels at Essex was aware of the dramatic change in his behavior at work.

Daniels has remained unemployed since his resignation in April, 1988. He was denied unemployment benefits and has resorted to public assistance to maintain his family.

## CONCLUSIONS OF LAW

This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and Title VII.

■ Title VII provides for a cause of action based on a hostile work environment and racial harassment. *Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1308 (7th Cir.1989); *Nazaire v. Trans World Airlines, Inc.*, 807 F.2d 1372, 1380–81 (7th Cir.1986). An employer may violate Title VII by creating or condoning an environment at the workplace which significantly and adversely affects the employee's well-being on the basis of race. *Hunter v. Allis–Chalmers Corp., Engine Div.*, 797 F.2d 1417, 1422 (7th Cir. 1986). However, "not every act of harassment of a person who happens to belong to a racial minority or other protected group violates the statute." *Malhotra*, 885 F.2d at 1308. The harassment must "create a discriminatory and offensive work environment so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers." *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir.1971).

As the Supreme Court stated in *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986):

For sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victims] employment and create an abusive working environment.' (citations omitted).

*Id.* at 67, 106 S.Ct. at 2405. In *North v. Madison Area Ass'n for Retarded Citizens*, 844 F.2d 401 (7th Cir.1988), the Seventh Circuit Court of Appeals noted that, "[w]hile *Meritor* was limited in its facts to a claim of sexual harassment, the conclusions reached by the Court are, in our opinion, not so limited, but rather apply to any claim under Title VII in which employer liability is an issue." *Id.* at 407, n. 7.

Recently, in addressing a Title VII claim based on sexual harassment, the Seventh Circuit held that, "[o]nly if the court concludes that the conduct would adversely affect the work performance and well-being of both a reasonable person and the particular plaintiff bringing the action may it find that the defendant has violated the plaintiff's rights under Title VII." *Brooms v. Regal Tube Co.*, 881 F.2d 412, 419 (7th Cir.1989). It is clear from the language of the Supreme Court in *Meritor* and the general discussion of racial harassment cases by the Seventh Circuit, that the subjective and objective analysis of sexual harassment required in *Brooms* is equally applicable to racial harassment cases.

■ The court must review the totality of the circumstances on a case by case basis in determining whether the quantity and frequency of incidents of harassment sufficiently constitute a violation of Title VII. *North v. Madison Area Ass'n for Retarded Citizens*, 844 F.2d 401, 409 (7th Cir.1988). Additionally, the courts have developed a six step test to analyze racial harassment cases brought under Title VII. The steps are:

(1) The employee belongs to a protected group;

(2) The employee was subject to unwelcome harassment;

(3) The harassment complained of was based on race;

(4) The harassment complained of affected a term, condition or privilege of employment;

(5) Plaintiff must be able to prove that the employer knew or should have known of the harassment and failed to take prompt remedial action; and

(6) The employee acted reasonably under the circumstances.

*Henson v. City of Dundee,* 682 F.2d 897, 909 (11th Cir.1982); *DeGrace v. Rumsfeld,* 614 F.2d 796 (1st Cir.1980); *Reeder–Baker v. Lincoln National Corp.,* 644 F.Supp. 983 (N.D.Ind.1986). "The existence of a hostile work environment is clearly a question of law to be decided once a court makes its finding of facts based upon the evidence of record." *Brooms,* 881 F.2d at 420.

■ Based on the findings of facts, this court determines that Daniels' work environment in the Concast Department at Essex, beginning in October, 1987, was a racially hostile work environment. The threatening nature of the incidents which began occurring at that time, the company's knowledge of the racially discriminatory conduct and the company's failure to respond in an effective manner to the discriminatory conduct lead this court to conclude that the conduct adversely affected Daniels' work performance and well-being and would have adversely affected the work performance and well-being of any reasonable person.

Although Daniels was not pleased with the racial jokes and other racially motivated teasing he was forced to tolerate for the first eight years he worked at Essex, he was not adversely affected by it. He was able to maintain a satisfactory work record and civil relationships with his fellow white employees. However, there was an obvious change in the nature of the racial teasing which began in the fall of 1987. A change from mere annoyance to threats of violence. This change led Daniels to become concerned for his personal safety as the only black man in his department. Daniels also became concerned for the safety of his four year old son. Daniels became unable to maintain an appropriate attendance record and when he did arrive at work he was unable to get along with his fellow employees. He did not know which of them had hung the dummy or who was writing the threatening messages on the walls. He clearly felt he could trust no one. He also lost a noticeable amount of weight and began to no longer care about his responsibilities to his job. In addition, Daniels was unable to convince his supervisor to take him seriously and was completely unprotected by Essex personnel from the possibility that the threats would become a reality.

The incidents themselves embodied the epitome of racial prejudice by using references to the KKK. The most violent threats to black society are well known to have come from that organization. Furthermore, there is no more chilling image than that of a black man being hung by the KKK. Any reasonable person who is targeted by such a terrorist organization over a period of time without any protection from his employer would surely suffer similar adverse effects as those experienced by Daniels.

Furthermore, each and every one of the six steps set forth by the courts for Title VII cases has been shown. The facts are abundantly clear that Daniels was a black employee at Essex who was subjected to unwelcome racial harassment which drastically affected the terms and conditions of his employment.

Daniels has proven by a preponderance of the evidence that Essex personnel knew of the most egregious incidents which occurred between October, 1987 and April, 1988 but that they failed to take any prompt remedial steps. *Brooms* requires that the steps taken by the employer "must be reasonably calculated to prevent further harassment under the circumstances of the case". *Id.* 881 F.2d 421. Repeatedly painting over the graffiti and merely removing the dummy do no more than remedy the *past* incidents of harassment. Essex took no steps to specifically warn the offending employees that such racial harassment would not be tolerated; no investigation was ever conducted into who did any of the incidents; and no warnings were ever posted that these specific types of incidents would warrant disciplinary action.

Finally, the preponderance of the evidence makes it abundantly clear that Daniels acted reasonably under the circumstances. Daniels acted reasonably in trying to get his supervisor to intervene on his behalf to stop the racial harassment, but to no avail. Seeing that his relationship with his fellow employees had deteriorated to the point of regular confrontations and that his work record had deteriorated to the point of warnings of termination, Daniels wisely chose to end his employment rather than risk a violent confrontation or being fired. There was no alternative choice for Daniels since his employer would do nothing to protect him or protect the work environment.

Therefore, Daniels has proven by a preponderance of the evidence that Essex violated his rights as protected by Title VII. Daniels was constructively discharged by the defendant's ineffective response to the racially hostile work environment at the Essex plant in Columbia City and he is therefore entitled to recover damages.

## DAMAGES

Having determined liability in the plaintiff's favor, this court now turns to the question of appropriate monetary relief. Daniels seeks back pay, prejudgment interest, reinstatement (or front pay) and attorneys fees and costs.

### Back Pay

 Lost wages are recoverable under Title VII. *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975). The liability established by Daniels entitles him to an award of back pay. *Id.; Hunter v. Allis–Chalmers Corp., Engine Div.*, 797 F.2d 1417, 1425 (7th Cir.1986). Back pay is to run from the date of plaintiff's termination until the date of final judgment. *Thorne v. City of El Segundo*, 802 F.2d 1131, 1136 (9th Cir.1986); *EEOC v. Monarch Mach.*

*Tool Co.*, 737 F.2d 1444, 1451–53 (6th Cir. 1980). Daniels' total wage loss to date is $38,548.84 [10].

### Prejudgment Interest

 Interest on wages that are due and owing is an available remedy to a plaintiff in a Title VII case, and can be awarded in the discretion of the trial court. *Hunter*, 797 F.2d at 1425–27; *Taylor v. Philips Industries, Inc.*, 593 F.2d 783, 787 (7th Cir.1979). Such an award makes the plaintiff whole by reimbursing him for the lost use of the money to which he was entitled. "Whether or not an award of interest should be granted turns upon whether the amount of damages is easily ascertainable." *Donnelly v. Yellow Freight System, Inc.*, 874 F.2d 402, 411 (7th Cir.1989). The lost pay damages suffered by Daniels are easily calculated by simple multiplication of hours which should have been worked by the hourly rate of pay. Therefore, this court finds that an award of prejudgment interest is justified in this case.

 There have been a wide variety of methods employed in determining the rate of prejudgment interest for Title VII cases. *See EEOC v. Wooster Brush Co. Employees Relief Association*, 727 F.2d 566, 579 (6th Cir.1984), and cases cited therein. This court follows the methodology set forth in *Dependahl v. Falstaff Brewing Co.*, 653 F.2d 1208 (8th Cir.), *cert. denied*, 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981). That case, involving a violation of the ERISA statute, held that the rate of prejudgment interest is a question of federal law when the cause of action arises from a federal statute, *Id.* at 1218, and found that the federal statute for postjudgment interest, 28 U.S.C. § 1961, was the most appropriate statute from which to calculate the rate of prejudgment interest. That statute computes the rate of interest as the

---

**10.** The parties stipulated to the fact that Daniels' wages in April, 1988, were $8.69 per hour. Plaintiff contended in the pre-trial order that the computation of lost wages as of the date of trial (November 13, 1989) was $27,425.64. Defendant did not contest this amount. This court

has therefore computed Daniels' lost wages by adding the amount computed by plaintiff to the amount resulting from multiplying forty hours per week by 32 weeks (the number of weeks from trial until June 25, 1990) by $8.69 per hour.

rate equal to the coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price for the last auction of fifty two week United States Treasury bills settled immediately prior to the date of the judgment. That rate is currently 8.24%, and thus, Daniels will be awarded prejudgment interest at that rate. Given the amount of back wages due, this court finds the total amount of prejudgment interest to be $3782.76.[11]

### Reinstatement–Front Pay

■ Appropriate relief under Title VII may include reinstatement. 42 U.S.C. § 2000e–5(g). In this case reinstatement, which is desired by the plaintiff but not by Essex[12], would not be appropriate. Front pay may be awarded when the "antagonism between employer and employee is so great that reinstatement is not appropriate." *Fadhl v. City and County of San Francisco*, 741 F.2d 1163, 1167 (9th Cir. 1984). Front pay is designed to make an employee whole for a reasonable future period, required for an employee to re-establish his rightful place in the job market. *Dillon v. Coles*, 746 F.2d 998, 1006 (3d Cir.1984).

■ In this case an award of front pay is necessary to make Daniels whole. Daniels has remained unemployed since April 25, 1988 when he was forced to resign from his position at Essex in Columbia City[13]. Although defendant stated that it

did not agree that front pay for two years was appropriate, defendant made no argument as to why it held this position. Hence, an amount of $35,455.20[14] is necessary to make Daniels whole.

### Attorneys Fees and Costs

Daniels is also entitled to his reasonable attorneys fees, 42 U.S.C. § 2000e–5(k); 42 U.S.C. § 1988, and his reasonable costs. 28 U.S.C. § 1920. The considerations relevant to computing a reasonable attorney's fee award have been set forth by the United States Court of Appeals for the Seventh Circuit in *Waters v. Wisconsin Steel Works*, 502 F.2d 1309 (7th Cir.1974), *cert. denied*, 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976). Daniels has not submitted a request for fees detailing the amount his attorney seeks under these provisions, and thus this court cannot enter an order setting forth the amount of the award. Plaintiff will be ordered to submit a motion to the court within twenty (20) days from the date of this order setting forth detailed information justifying his request for fees.

### CONCLUSION

Plaintiff has established by a preponderance of the evidence that Essex discriminated against him on the basis of race in violation of Title VII. Defendant is hereby ORDERED to pay the plaintiff $38,548.84 for lost wages, $3782.76 for prejudgment interest on those wages, $35,455.20 for front pay and reasonable costs and attor-

---

**11.** This amount represents the interest accrued through monthly compounding of the interest generated by the amount of backpay due. The court has calculated the monthly balance of wages due beginning April 25, 1988 until June 25, 1990 by merely dividing the total backpay award amount by 26 months. The court then compounded the interest due at the end of each month, adding that interest to the monthly balance due for calculation purposes for the following month. The $3782.76 figure represents the sum of the interest amounts so generated.

**12.** Defendant has indicated that it has no intention of reinstating the plaintiff in its employ.

**13.** Defendant has not raised the affirmative defense of failure to mitigate damages. The bur-

den is clearly on the defendant to prove that the plaintiff did not reasonably seek comparable employment and that the plaintiff had a reasonable chance of getting comparable employment if he sought it. *Wheeler v. Snyder Buick, Inc.*, 794 F.2d 1228, 1234 (7th Cir.1986); *Sprogis v. United Air Lines*, 517 F.2d 387, 392 (7th Cir. 1975). Since defendant presented no evidence on the issue, plaintiff is presumptively entitled to back pay and reinstatement/front pay based on the court's finding that defendant violated Title VII. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975).

**14.** This amount was taken from the uncontested proposed findings of fact submitted by the plaintiff.

neys fees. Plaintiff is hereby ORDERED to file a motion for fees and costs within twenty (20) days of the date of this order, detailing his request for fees.