Linda DAVIS, Plaintiff,

v.

**KANSAS CITY HOUSING AUTHORITY, Defendant.**

No. 91–0750–CV–W–3.

United States District Court, W.D. Missouri, W.D.

May 25, 1993.

---

Samuel I. McHenry, Legal Aid of Western Missouri, Kansas City, MO, for Linda J. Davis.

Glenn E. Bradford, Marilyn B. Keller, Wyrsch, Atwell, Mirakian, Lee & Hobbs, P.C., Kansas City, MO, for Housing Authority of Kansas City.

## ORDER

ELMO B. HUNTER, Senior District Judge.

This case involves the plaintiff's claim of discriminatory treatment in the workplace on the basis of her race, white. Plaintiff made claims under both Title VII of the Civil Rights Act of 1964, and the Missouri Human Rights Act ("MHRA"). After a jury trial on her state law claim, a verdict was rendered in plaintiff's favor for $35,474.44 in actual damages and $25,000.00 in punitive damages.

Now pending before the Court is plaintiff's Title VII claim, which was tried to the Court simultaneously with plaintiff's state law claim, and defendant's post-trial motions seeking to dismiss the state law claim on grounds of lack of subject matter jurisdiction, lack of pendent jurisdiction,[1] and Elev-

---

1. Currently referred to as "supplemental juris- diction" after the passage of 28 U.S.C. § 1367.

enth Amendment sovereign immunity. While defendant's motions are creative and filled with grotesquely long string-cites, the Court finds them to be unpersuasive on the instant facts.

Furthermore, the Court finds that plaintiff was illegally discriminated against on the basis of her race and that relief pursuant to Title VII is appropriate. This finding is made of the Court's own independent view of the facts, although it is arguable that on common issues of fact, the Court is bound by the jury's findings. *See Fray v. Omaha World Herald*, 960 F.2d 1370, 1378 (8th Cir. 1992); *Williamson v. Handy Button Mach. Co.*, 817 F.2d 1290 (7th Cir.1987). The Court's findings of fact and conclusions of law and the discussion of defendant's other motions follow.

## I. FINDINGS OF FACT

Linda Davis is a white female citizen of the United States. She was employed by the defendant Housing Authority of Kansas City ("HAKC") as a live-in property manager from November 5, 1988, until September 2, 1990.[2] Plaintiff was assigned to manage the defendant's Heritage Manor property, which is a low-income housing project that primarily serves elderly and handicapped residents. The defendant is a statutory municipal corporation organized and existing under the laws of the State of Missouri.

Shortly after beginning her employment with the defendant, the plaintiff came under the supervision of Ms. Annie West–Gates, who is black. Ms. Davis was the only white property manager supervised by Ms. Gates. From the outset, Ms. Davis's employment was marked by disparate treatment and deliberate attempts by Ms. Gates and others to make plaintiff's job more difficult than was necessary.

Upon arrival at Heritage House, Ms. Davis had clerical support from Mr. Robert Jones, who is black. Shortly after Ms. Davis's arrival at Heritage House, Mr. Jones was reassigned to other duties within the HAKC. Mr. Jones was not replaced. Furthermore, Ms. Davis did not receive adequate training on how to complete the paperwork associated with her job, which later became a source of conflict between plaintiff and her supervisor.

It is undisputed that Ms. Davis was an exemplary employee in the area of tenant relations. Following her coming on to the job, rent collections and living conditions went up, while incidents of crime went down. This was exactly what hiring a live-in property manager for Heritage Manor was supposed to accomplish.[3] In spite of this success at what one would presume a housing authority is trying to accomplish, Ms. Davis was repeatedly chastised and criticized for turning in her paperwork late or technically defective. Ms. Davis was not offered additional training or other assistance as a means to correct any alleged deficiencies in her paperwork.

Defendant also made it more difficult for Ms. Davis to properly prepare for a standardized property manager's examination she was required to take and pass. Plaintiff was not provided with a substitute manager to perform her duties while she was preparing to take the exam while the other black property managers were. Furthermore, Ms. Davis was denied assistance in moving out of her apartment, forcing her to make the move herself shortly before the exam. Ms. Davis had volunteered to move out of her apartment to ensure that one of the residents would not have to move out of the building. Ms. Davis, who failed the exam, was placed on probation as a result of that failure while

**2.** Plaintiff's proposed findings of fact show plaintiff was employed until September 24, 1990. Defendant's proposed finding of facts state plaintiff was employed until September 2, 1990. Ms. Davis testified that she was employed by the defendant until September 14, 1990. *See* Trial Transcript Vol. 1, p. 31–32. The Court's determination is based on the pretrial stipulation of facts that indicates the September 2, 1990, date as plaintiff's last day of employment.

**3.** As a live-in property manager, Ms. Davis was available to assist tenants twenty-four hours a day. She also would "patrol" the hallways of her building alone at night armed only with a two-way radio, in an effort to curb drug sales and other crime. Her success in cleaning-up Heritage Manor was not disputed by the defendant.

other black property managers who had also failed were not.

Ms. Davis's attempt to move to unused space was also marred by a failure of the defendant to treat her fairly. She was forced to live in sub-standard housing, which included gaps between the wall and floor that led directly into the basement trash room, and when work was "completed," it was shoddy and resulted in damage to her personal belongings. At one point during the months her new living quarters were being readied, Ms. Davis was forced to obtain offsite living space due to the condition of her assigned space.

Shortly before her resignation, Ms. Davis was called into Mr. Sanders's office and informed that the maintenance man at her building, Verle Norton, had filed a written complaint that she had offered him sexual favors in return for maintenance work. Following the meeting, Mr. Sanders suggested that Ms. Davis may as well resign since she would likely be fired anyway. Shortly thereafter, Ms. Davis did in fact submit a letter of resignation "under protest." The sexual favor incident was not mentioned by the defendant in any later correspondence and a written charge of that allegation was never produced.

In the nearly two years that Ms. Davis was employed by the defendant, her rate of pay went from $7.29 per hour to $7.54 per hour. Other property managers were normally paid at a starting rate of pay of $9.42 per hour. In fact, no other property manager was paid below $9.42 per hour and the majority of defendant's property managers were paid over $10.00 per hour.

The defendant was aware of the race based harassment and disparate treatment suffered by Ms. Davis.

## II. CONCLUSIONS OF LAW

This Court has jurisdiction over plaintiff's Title VII claim (Count 1) pursuant to 42 U.S.C. § 2000e–5(f). This Court has jurisdiction over plaintiff's Missouri Human Rights Act claim (Count 2) pursuant to 28 U.S.C. § 1367. Venue is proper in this district pursuant to 28 U.S.C. § 1391.

Ms. Davis was an employee of defendant as that term is defined by Title VII. Defendant Housing Authority of Kansas City is an employer within the meaning of that term as provided by Title VII.

The plaintiff has satisfied all statutory prerequisites for bringing this Title VII civil action.

When the totality of the circumstances are considered, the plaintiff has established that: 1) she is a member of a protected class; 2) she was subjected to unwelcome harassment and disparate treatment; 3) that harassment and disparate treatment was based upon her race; 4) the harassment affected the terms and conditions of her employment; and 5) the defendant knew of such harassment and failed to take appropriate remedial action.

Defendant's actions and failure to take appropriate remedial action created a hostile work environment in violation of Title VII. That hostile work environment had the purpose and effect of unreasonably interfering with plaintiff's work performance and created an intimidating and hostile work environment. The plaintiff involuntarily resigned from her position to escape the intolerable and illegal working conditions created by the defendant.

The plaintiff is entitled to damages in the form of back pay, prejudgment interest on the amount of back pay due and owing, reinstatement to her former position or one comparable to it with seniority being retroactively restored, and reasonable attorney's fees.

## III. DISCUSSION

### A. THE TITLE VII CLAIM

■ The plaintiff's theory of recovery in this action is two-fold. First, she claims to have been harassed and treated differently than other employees because of her race, white. Second, she claims that this treatment of her resulted in her constructive discharge. Just as the jury that tried her state law claim did, the Court agrees with the plaintiff.

■ For the plaintiff to recover on a constructive discharge claim theory of recovery,

she must show not only discrimination but also that her employer deliberately made working conditions intolerable and drove her to involuntarily resign. *Katradis v. Dav–El of Washington, D.C.,* 846 F.2d 1482 (D.C.Cir. 1988). The plaintiff in this case has shown illegal discrimination in that her working environment was dominated by racial hostility and harassment, which is itself a violation of Title VII. *Gilbert v. City of Little Rock, Arkansas,* 722 F.2d 1390 (8th Cir.1983).

■ While they disagree as to whether the plaintiff was discriminated against in this case, both parties agree that for plaintiff to be able to show that she was illegally discriminated against under a hostile work environment theory, she must show:

> 1) she is a member of a protected group; 2) she was subject to unwelcome racial harassment; 3) the harassment/hostility was based on her race; 4) the harassment affected a term, condition, or privilege of her employment; and 5) the defendant knew or should have known of the harassment and failed to take appropriate remedial action.

*Burns v. McGregor,* 955 F.2d 559 (8th Cir. 1992); *Hall v. Gus Construction,* 842 F.2d 1010 (8th Cir.1988); *Harris v. Home Savings Assoc.,* 730 F.Supp. 298 (W.D.Mo.1989).

It is undisputed that the plaintiff is a member of a protected group and that she did not welcome the harassment she suffered by soliciting or enticing it.

That the harassment was based on her race is shown by both direct and circumstantial evidence. The brunt of the harassment and disparate treatment was delivered by plaintiff's supervisor, Ms. Gates. The illegal conduct manifested itself in many ways. It included denial of needed clerical and maintenance support staff that was provided to black property managers, reference to the plaintiff as a "white-bitch," belittling and humiliating the plaintiff at property manager meetings where she was the only white person present, hounding the plaintiff to be at her assigned post and writing her up for any failure to do so regardless of the reason for failing to be there, ignoring her requests for assistance in carrying out her duties as property manager, providing the plaintiff with

only sub-standard housing for several months, and dealing with plaintiff in harsher terms than black property managers were subjected to. Furthermore, a general atmosphere of racial animus towards whites existed at the HAKC as was testified to by Ms. Rhodes, a former employee of the defendant, who is black.

Ms. Rhodes testified to lots of "reversed racial slurs," comments that the HAKC was "becoming lily white," and that the anti-white atmosphere was "thick." She noted that these problems began after the plaintiff was hired and was in response to changes in personnel that resulted in more whites being hired by the defendant.

The plaintiff also presented testimony from Mr. Donald Golub, who reported being treated in a manner similar to Ms. Davis. Mr. Golub is white. Mr. Golub was an assistant property manager and worked alongside another assistant property manager, Kim Jackson. Ms. Jackson is black. Golub testified that he was not trained on the paperwork aspects of his job the same as Ms. Jackson, that he was assigned dangerous field duties to be carried out alone while he was always required to accompany Ms. Jackson on those same assignments, and that he was given a poor evaluation by Ms. Gates who had not bothered to determine what Mr. Golub had accomplished during the relevant time period, resulting in that evaluation being rejected by Mr. Fisher and having to be redone. Mr. Golub also reported having his radio transmissions ignored while he was in the field, which was a potentially dangerous situation. As stated in the findings of fact and conclusions, the Court finds that the harassment, disparate treatment, and general lack of cooperation experienced by the plaintiff was based on her race.

■ The plaintiff has also shown that the defendant's illegal conduct affected a term, condition, or privilege of her employment. A working environment dominated by racial hostility and harassment constitutes a violation of Title VII, regardless of any other tangible job detriment to an employee. *Gilbert v. City of Little Rock, Arkansas,* 722 F.2d 1390 (8th Cir.1983). The hostile work

environment theory of discrimination is based upon an employee's right to work in an environment free of unlawful discrimination, and injury results from the lost benefits of associating with persons of other racial groups. *Clayton v. White Hall School District,* 875 F.2d 676 (8th Cir.1989). The environment Ms. Davis was subjected to prevented her from carrying out her duties as a property manager in the manner she should have been allowed to do them in.

Ms. Gates actions were blatant attempts to make Ms. Davis's job more difficult than it had to be. These actions include improper training, failure to provide Ms. Davis with clerical and maintenance support, use of racial epithets, disproportionate punishment, and belittling and humiliating treatment on the job. These matters, as well as the general atmosphere of racial animus that existed at and was condoned by the defendant, all affected the terms, conditions, and privileges of Ms. Davis's employment. And while Ms. Davis does not make a disparate pay claim, her maximum pay of $7.54 per hour, which is approximately $2.50 less than her nearest contemporary, is further evidence that her race affected the terms of her employment.[4]

■ Finally, there is little question that the defendant knew of racial harassment and disparate treatment suffered by Ms. Davis and did little or nothing to correct. In the first instance, Ms. Gates, who delivered most of the harassment and disparate treatment, is a supervisory level employee of the defendant and had sufficient authority over the plaintiff for her to be considered an agent of the defendant. Secondly, the matters of racial animus against whites, and specifically Ms. Davis, was readily apparent to Mr. Fisher, the Director of the HAKC. In fact, Ms. Rhodes testified to specifically bringing the problem of racial animus to Mr. Fisher's attention but that he chose not to believe it. Therefore, Ms. Davis has shown that she was illegally discriminated against by her employer.

■ Having shown that she was discriminated against, the Court now addresses plaintiff's contention that she was constructively discharged. An employee is constructively discharged from employment, for purposes of a discrimination action, if the employer intentionally made working conditions so difficult that a reasonable person in the employee's shoes would feel compelled to resign. *Maney v. Brinkley Municipal Waterworks and Sewer Dept.,* 802 F.2d 1073 (8th Cir.1986). In light of the treatment the plaintiff was subjected to and the general atmosphere at the HAKC that it was becoming "lily-white," the Court finds that a reasonable person in Ms. Davis's shoes would feel compelled to resign. Ms. Davis, in fact, who probably stayed longer than most people would have, suffered emotionally and physically from her experience.[5] Furthermore, the Court finds that such conduct was intended to cause Ms. Davis to quit.

## B. DAMAGES

■ The Court's purpose in determining the appropriate damage award is, of course, to make the plaintiff whole. It is this Court's duty to place the plaintiff in the position she would have been in absent the defendant's discriminatory action. *Nord v. U.S. Steel,* 758 F.2d 1462 (11th Cir.1985). To fulfill that duty, the Court will award plaintiff back pay, prejudgment interest on the amount of back pay due and owing, reinstatement to the same or similar position she held before being constructively discharged with seniority being retroactively applied, and reasonable attorney's fees.

■ Employees who are discriminated against are entitled to back pay and reinstatement if they were actually or constructively discharged from their employment. *Maney v. Brinkley,* 802 F.2d 1073 (8th Cir. 1986). Plaintiff's back pay will be measured from the date of discharge, September 2, 1990, until the date the final judgment in this action is entered, and is to be reduced by any interim earnings. That back pay will be

---

4. Neither party put on evidence as to why Ms. Davis was paid so much less than the other property managers.

5. Ms. Davis testified that her ordeal caused her to lose 17 pounds of her normal body weight of 98 pounds.

calculated by the parties at the rate of $9.42 per hour, the rate of pay paid· to starting property managers.

■ As a general rule, prejudgment interest is to be awarded when the amount of the underlying liability is reasonably capable of ascertainment and the relief . granted would otherwise fall short of making the claimant whole because she has been denied the use of money which was legally due her. *Stroh Container Co. v. Delphi Industries, Inc.*, 783 F.2d 743 (8th Cir.1986). Interest on wages that are due and owing is an available remedy in Title VII cases, and may. be awarded in the discretion of the Court. *Daniel v. Essex Group, Inc.*, 740 F.Supp. 553, 561 N.D.Ind.1990) (citing *Taylor v. Philips Industries, Inc.*, 593 F.2d 783, 787 (7th Cir.1979)). As in *Daniel,* the Court ·finds that the appropriate rate of interest to calculate plaintiff's damages is the statutory rate of interest used to calculate post-judgment interest. Therefore, the parties will be directed to calculate plaintiff's current damages using 3.25% as the rate at which prejudgment interest is to be calculated. The interest amount is to be compounded annually.

■ Reinstatement is such a basic element of Title VII relief that granting such relief is presumed appropriate and, except in extraordinary cases, is required. *Weaver v. Casa Gallardo*, 922 F.2d 1515 (11th Cir. 1991); *Darnell v. City of Jasper Alabama*, 730 F.2d 653 (11th Cir.1984). In this case, the plaintiff has indicated her desire to return to work for the defendant. There is no indication that this case is so extraordinary that reinstatement should be denied. Accordingly, Ms. Davis is to be rehired by the · defendant to her former position or one that. is equivalent to the position of property manager. Furthermore, Ms. Davis's seniority is to be retroactively applied as if she has been in the continuous employ of the defendant since November 15, 1988. *See EEOC v. Rath Packing Co.*, 787 F.2d 318 (8th Cir.. 1986).

■ A prevailing party in an action brought under Title VII may be awarded attorney's fees in the Court's discretion. 42 U.S.C. § 2000e–5(k). While discretionary language is used in the statute, prevailing plaintiff's are essentially entitled to attorney's· fees unless special circumstances would render such an award unjust in light of Congressional goals underlying enforcement of fee awards in civil rights litigation. *Lyte v. Sara Lee Corp.*, 950 F.2d 101 (2d Cir.1991). No such circumstances exist in this case. Plaintiff's counsel, therefore, will be required to submit an application for reasonable attorney's fees within twenty days of the date of this Order.[6] Having decided in favor of the plaintiff on her Title VII claim, the defendant's post-trial motions will be discussed next.

## C. MOTION TO DISMISS: LACK OF SUBJECT MATTER JURISDICTION

■ · Defendant's post-trial motion attacking the Court's subject matter jurisdiction is essentially a question of whether the plaintiff's EEOC charge can be said to fairly encompass her claim of constructive discharge, which is the theory of recovery submitted . to the jury on her MHRA claim. Defendant attempts to characterize plaintiff's failure to specifically allege constructive discharge· in her EEOC charge as a fatal flaw that prevents this Court from obtaining subject matter jurisdiction over that claim. That characterization is critical to defendant's motion since a lack of subject matter jurisdiction may be raised at any time during a case's processing. *E.g. Peoples Bank v. Calhoun*, 102 U.S. (12 Otto) 256, 26 L.Ed. 101 (1880). Defendant's attempt, however, is unavailing and its motion will ·be denied on the grounds that the alleged defect is not jurisdictional and defendant has waived any objection to the scope of the EEOC charge. Furthermore, the constructive discharge claim ·is "like or reasonably related to" the charges filed with the EEOC, which serves

---

**6.** Hopefully it will be unnecessary to litigate the attorney's fees claim. If the parties are able to stipulate to an amount at their in person meeting that is required by the final portion of this Order, that litigation will be avoided.

to constructively satisfy her obligation to exhaust her administrative remedies.

## 1. Timely filing of an EEOC charge is not jurisdictional.

 "[F]iling a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel and equitable tolling." *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393, 102 S.Ct. 1127, 1132, 71 L.Ed.2d 234 (1982); *see also* 2 Lex Larson, *Employment Discrimination* § 49.14 (1989). In spite of this authority, defendant argues *Zipes* is limited to the timeliness of filing and not the failure to file, which is what defendant contends plaintiff has done by not including a specific constructive discharge claim in the EEOC charge she did file. While *Zipes* appears to leave open the possibility that such a distinction may exist, *see id.* at 393 n. 8, 102 S.Ct. at 1132 n. 8, such a narrow reading is inconsistent with the remedial purpose of Title VII and later case authority.

The non-jurisdictional nature of the prerequisites to filing suit under Title VII was thoroughly discussed in *Jackson v. Seaboard Coast Line Railroad Co.*, 678 F.2d 992 (11th Cir.1982). In *Jackson*, the Court held that the failure to name a party in a previously filed EEOC charge did not deprive the district court of subject matter jurisdiction where that party waited until after the trial to raise the issue, which is exactly the same time the HAKC has chosen to raise the current "jurisdictional" issue. Such an outcome is clearly inconsistent with the idea that failure to satisfy Title VII's pre-filing requirements· prevents a district court from obtaining jurisdiction.

Also in *Jackson*, the court thoroughly discusses the Supreme Court's treatment of the filing prerequisites when in a class action certain members of the class have not filed any charge of discrimination with the EEOC. Specifically, the Supreme Court's decision in *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), allowed Title VII relief to be awarded class members who had not exhausted or participated in the administrative process. *Id.* at 414, 95 S.Ct. at 2370. Contrasted with the Court's refusal to allow participation of class members who do not themselves satisfy the amount in controversy requirement of 28 U.S.C. § 1331 from participating in a class action brought pursuant to a district court's diversity jurisdiction, the non-jurisdictional nature of Title VII's filing prerequisites becomes clear. *See Zahn v. International Paper Co.*, 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973) (refused to allow participation in class if potential class members who had not satisfied jurisdictional amount). That this disparate treatment is indicative of the Supreme Court's position that Title VII's pre-filing requirements are not jurisdictional is also noted in *Coke v. General Adjustment Bureau, Inc.*, 640 F.2d 584, 589 (5th Cir.1981) (en banc).

In a more recent and shorter opinion on the subject matter jurisdiction question, the Fifth Circuit held that the total failure to file a charge with the EEOC before bringing suit in the district court did not prevent that court from obtaining subject matter jurisdiction. *Womble v. Bhangu*, 864 F.2d 1212 (5th Cir.1989). Rather, while such failure may result in the plaintiff's being barred, it was error for the district court to dismiss the complaint for lack of subject matter jurisdiction. *Id.* at 1213. Having decided that plaintiff's alleged failure to specifically allege a constructive discharge claim with the EEOC, the Court must now decide if defendant has waived its right to raise the issue.

## 2. Defendant HAKC has waived its right to raise the issue of plaintiff's failure to allege constructive discharge with the EEOC.

 To say that the defendant has waited too long to raise plaintiff's alleged failure to specifically claim constructive discharge is, at a minimum, an understatement. Plaintiff's "Amended Complaint" filed November 16, 1991, and Plaintiff's "Second Amended Complaint" filed on June 19, 1992, both put defendant on notice that she intended to submit a claim of constructive discharge to the jury and the Court. Furthermore, Mr. McHenry's opening statement unequivocally stated that the plaintiff was put in the posi-

tion "where she had to leave her employment" and that she was "forced to submit her resignation." *See* Trial Transcript Vol. 1, p. 5.

■ Because the conditions precedent to filing suit under Title VII are not jurisdictional, a party may not wait until after trial to take issue with an opposing party's general averment that all conditions precedent have been satisfied. *Jackson v. Seaboard Coast Line Railroad Co.,* 678 F.2d 992, 1010 (1982). A party wishing to deny the occurrence of any conditions precedent must do so "specifically and with particularity." *See* Fed.R.Civ.P. 9(c). In this case, defendant merely entered a general denial of plaintiff's allegation made in paragraph 11 of her Second Amended Complaint that she had "completely exhausted her administrative remedies." As was the case in *Jackson,* this general denial fails to satisfy the requirements of Rule 9(c). As such, and as was the case in *Jackson,* the defendant has waived its right to raise this issue.

■ Finally, on the issue of waiver, not only has the defendant waited until after trial to raise the issue of plaintiff's alleged failure to specifically raise the constructive discharge claim, defendant's counsel failed to make a specific objection to Instruction Number 5, which submitted the constructive discharge claim to the jury.[7] Failing to make an objection, before the jury retires to deliberate, that distinctly states a defendant's objection to the submission of a constructive discharge claim, works to bar the defendant from raising that issue at this late hour. *See* Fed.R.Civ.P. 51; *Morris v. Travisono,* 528 F.2d 856, 859 (1st Cir.1976). For all the foregoing reasons, defendant is deemed to have waived its right to object to plaintiff's submission of a constructive discharge claim on the grounds that that claim was not presented to the EEOC.

### 3. Plaintiff's constructive discharge claim was "like or related to" her claim filed with the EEOC.

The administrative procedures that are prerequisites to the filing of a lawsuit under Title VII evidence a clear policy in favor of encouraging administrative conciliation of employment discrimination complaints before resorting to federal court litigation. Attempts to circumvent the preferred method of conciliation by filing a claim in federal Court without having first sought relief through the administrative process must be discouraged. In this case, however, no such attempt to circumvent the administrative process is present nor can it be inferred.

■ A plaintiff will be deemed to have exhausted administrative remedies if the allegations of the judicial complaint are like or reasonably related to the administrative charges that were timely brought. *Anderson v. Block,* 807 F.2d 145, 148 (8th Cir.1986) (citing *Ong v. Cleland,* 642 F.2d 316, 318 (9th Cir.1981)). The defendant has gone to great lengths to demonstrate that a constructive discharge claim is a separate and distinct claim from a charge of disparate treatment. Distinguishing the plaintiff's constructive discharge allegation as a separate claim, however, does not answer the question of whether that claim was "like or reasonably related to" the administrative charges Ms. Davis filed with the EEOC. In other words, the "like or reasonably related to" test applies to situations where the defendant alleges that the plaintiff has added charges to its judicial complaint that were not raised in the administrative charge. *See Daines v. City of Mankato,* 754 F.Supp. 681 (D.Minn.1990); *Buffington v. General Time Corp.,* 677 F.Supp. 1186 (M.D.Ga.1988).

In the particulars of her charge filed with the EEOC, plaintiff complained of race discrimination in the terms and conditions of her employment. While she did not use the phrase "constructive discharge" in her charge, she listed September 24, 1990, as the date of the most recent incident of discrimination. Per her letter of resignation, September 24, 1990, was to be the plaintiff's last day of employment. Furthermore, in her actual letter of resignation plaintiff stated

---

**7.** Defense counsel did object to the giving of the instruction but only in the general sense that the evidence was insufficient to warrant the giving of any instructions because the plaintiff had failed to make a submissible case. *See* Trial Transcript Vol. III, p. 95.

that her resignation was being tendered at the defendant's request, that is was "forced," and that it was "under protest." Accordingly, the Court finds that the constructive discharge claim submitted to the jury and that is a part of plaintiff's Title VII claim was sufficiently related to the charges filed with the EEOC and, therefore, she will be deemed to have exhausted her administrative remedies.

### D. MOTION TO QUASH VERDICT: ELEVENTH AMENDMENT IMMUNITY

Defendant's second post-verdict motion seeks to quash the jury's verdict based on a lack of pendent jurisdiction (now called supplemental jurisdiction with the passage of 28 U.S.C. § 1367) due to defendant's assertion that the Eleventh Amendment bars plaintiff's claim of a violation of the MHRA from being brought in federal court. The Eleventh Amendment provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI.

Although the terms of the amendment only prevent suits against a state by citizens of another state or foreign country, the Supreme Court has consistently held that the Eleventh Amendment also bars suits against a state by its own citizens. *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890).

It is the defendant's position that the State of Missouri's act of including in its definition of an employer "the state, or any political or civil subdivision thereof," the State has simply waived its sovereign immunity from being sued in a state court. Mo.Rev.Stat. § 213.010.6 (VAMS Supp.1993). As further support for its argument, defendant cites the specific language of the MHRA that provides for the commencement of a civil action pursuant to the Act. That language provides that such an action "may be brought in any circuit ... either before a circuit or associate circuit judge." Mo.Rev.Stat. § 213.111.1 (VAMS Supp.1993).

The jurisdiction of the federal courts is defined and limited by the provisions of Article III and by the acts of Congress. *Owen Equipment & Erection Co. v. Kroger*, 437 U.S. 365, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978). Defendant's claim of a lack of "pendent jurisdiction" depends entirely on the Eleventh Amendment as a bar to suit since the right to assert such jurisdiction is a law of the United States and has precedence over any contrary state law. *Thompkins v. Stuttgart School District No. 22*, 787 F.2d 439 (8th Cir.1986); *Jones v. Intermountain Power*, 794 F.2d 546 (10th Cir.1986). Accordingly, defendant is correct when it asserts that there can be no pendent jurisdiction where the Eleventh Amendment is applicable. *See Standing Rock Sioux Indian Tribe v. Dorgan*, 505 F.2d 1135 (8th Cir. 1974). Plaintiff is also correct, however, when she asserts that the states have no power to enlarge or to restrict federal jurisdiction. *Thompkins*, 787 F.2d at 441.

Determining the existence of Eleventh Amendment immunity from suit in federal court is a two-step process. *Aerojet–General Corp. v. Askew*, 453 F.2d 819 (5th Cir.1971). Those steps are: 1) determining whether the action is against the state; and 2) if the action is against the state, whether the state consented to be sued. *Id.* Meeting the requirements of both steps is a prerequisite to successfully claiming such immunity.

Defendant Housing Authority of Kansas City is a statutory municipal corporation organized and existing as a political subdivision of the State of Missouri. Mo.Rev. Stat. § 99.040(1) (VAMS 1989). As such, defendant claims that it is entitled to the same immunity from suit in federal court that the states enjoy pursuant to the Eleventh Amendment. However, the Eleventh Amendment's bar to a district court's jurisdiction in suits against state's does not extend to cities, municipalities, or other discreet political subdivisions that, like the Housing Authority of Kansas City, are sufficiently independent from the state. *Mt. Healthy City School Dist. v. Doyle*, 429 U.S.

274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Schopler v. Bliss,* 903 F.2d 1373 (11th Cir. 1990); *Meade v. Grubbs,* 841 F.2d 1512 (10th Cir.1988); *Gilliam v. City of Omaha,* 524 F.2d 1013 (8th Cir.1975).

The authority cited by defendant as support for the extension of Eleventh Amendment immunity to it is unpersuasive. The federal authority cited dealt only with situations where the state was "in effect" the party being sued. The state authority mainly dealt with sovereign immunity and is, therefore, inapposite. One of defendant's state court authorities, *Land Clearance for Redevelopment Authority of Kansas City, Missouri v. Waris,* 790 S.W.2d 454 (Mo. banc 1990), supports the idea of the defendant's independence rather than its status as an arm of state, which supports the Court's position that the defendant is not entitled to Eleventh Amendment immunity. Because the defendant in this case is not an arm of the state or its alter ego, defendant's claim of Eleventh Amendment immunity must fail.

Accordingly, it is hereby ORDERED that

1) judgment be entered in favor of the plaintiff on the issue of liability on her Title VII claim;

2) the parties, within the next ten days, shall meet in person for the purpose of agreeing upon a proposed final judgment on the plaintiff's Title VII claim and entering into a stipulation as to the amount of back pay due and owing to date, the amount of prejudgment interest due and owing, the amount due plaintiff as reasonable attorney's fees, and the position that the plaintiff is to be rehired for;

3) the proposed Order and stipulation contemplated by Order number 2 shall be filed within fifteen days of the date of this Order;

4) if the parties fail to stipulate to any of the items requested in Order number 2, each party shall file a separate proposed finding within twenty days of the date of this Order and, if the parties' disagreement concerns the amount of reasonable attorney's fees, the plaintiff shall submit a request for fees within twenty days of the date of this Order to which the defendant shall file a response within five days of the date that request is filed; and

5) all the defendant's pending motions to dismiss are denied.

IT IS SO ORDERED.