John D. RUDOLPH, on behalf of himself and all similarly situated persons, Plaintiffs,

v.

ADAMAR OF NEW JERSEY, INC., d/b/a Tropicana Casino and Resort, Defendant/Third–Party Plaintiff,

v.

The State of New Jersey, Donald T. Difrancesco, Acting Governor of the State of New Jersey, John J. Farmer, Jr., Attorney General of the State of New Jersey, James R. Hurley, Chairperson of the New Jersey Casino Control Commission, Third–Party Defendants.

No. CIV. A. 00–190.

United States District Court,
D. New Jersey.

July 31, 2001.

Stephen G. Console, Console Law Offices, LLC, Deborah H. Simon, The Mager Law Firm, P.C., Westmont, NJ, for Plaintiff, John D. Rudolph.

Louis R. Moffa, Jerry L. Tanenbaum, Schnader Harrison Segal & Lewis LLP, Cherry Hill, NJ, for Defendant/Third–Party Plaintiff, Adamar of New Jersey, d/b/a/ Tropicana Casino and Resort.

John J. Farmer, Jr., Attorney General of New Jersey, Mark Turner Holmes, Deputy Attorney General, Trenton, NJ, for Third–Party Defendants, the State of New Jersey, Donald T. DiFrancesco, Acting Governor of the State of New Jersey, and John J. Farmer, Jr., the Attorney General of the State of New Jersey.

John R. Zimmerman, General Counsel, New Jersey Casino Control Commission, David C. Missimer, Assistant General Counsel, Atlantic City, NJ, for Third–Party Defendant, James R. Hurley, Chairman, New Jersey Casino Control Commission.

## OPINION

ORLOFSKY, District Judge.

## I. INTRODUCTION

The pending motions before this Court require the consideration and resolution of several novel questions of law. First, the Court must decide whether the Defendant/Third-party Plaintiff, Adamar of New Jersey, d/b/a Tropicana Casino and Resort ("Tropicana"), has a right, either under federal common law or by statute, specifically, 42 U.S.C. § 1988, to seek contribution and indemnification from the State of New Jersey for any attorneys' fees ultimately awarded to the Plaintiff against the Defendant/Third–Party Plaintiff. Second, this Court must decide whether the Eleventh Amendment bars the Plaintiff's and Third–Party Plaintiff's claims, asserted under the New Jersey Law Against Discrimination ("NJLAD") against the State of New Jersey, to the extent that these claims are alleged against the State not in its capacity as an employer, for which it has clearly waived its sovereign immunity under the NJLAD, but in its legislative and executive capacities. Finally, this Court must determine whether the New Jersey Casino Control Commission is the alter-ego of the State of New Jersey and is therefore entitled to Eleventh Amendment immunity.

For the reasons set forth in this Opinion, I conclude that Tropicana has neither a statutory, nor a common-law right to seek contribution or indemnification from the State for Plaintiff's attorneys' fees. I further conclude that while the State of New Jersey has waived its sovereign immunity to be sued under the NJLAD, it has done so only in its capacity as an employer. Accordingly, I conclude that the State of New Jersey enjoys Eleventh Amendment immunity against suit in federal court under the NJLAD when the State is sued in its legislative and executive capacities. Finally, I conclude that the New Jersey Casino Control Commission is an alter ego of the State of New Jersey and is therefore entitled to Eleventh Amendment immunity.

## II. PROCEDURAL HISTORY

On January 12, 2000, Plaintiff, John D. Rudolph ("Rudolph"), filed a Complaint

with this Court against his former employer, Adamar of New Jersey, Inc., which does business as Tropicana Casino and Resort ("Tropicana"). Rudolph, who is a white male, alleges that Tropicana, through the implementation of its Equal Employment and Business Opportunity Plan ("EEBOP")[1], discriminated against him and all similarly situated individuals on the basis of race and sex, in violation of 42 U.S.C. § 1981 (Count I) and the NJLAD. (Count II). In addition to these class claims, Rudolph, who is fifty years old, alleges an individual claim for discrimination on the basis of age, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* (Count III) and the NJLAD (Count IV).

On February 25, 2000, Tropicana filed a Third Party Complaint against the State of New Jersey, the Governor of the State of New Jersey, now Acting Governor Donald T. DiFrancesco ("the Governor"), and John J. Farmer, Jr., the Attorney General of the State of New Jersey ("the Attorney General") (together, "the State Defendants"). Both the Governor and the Attorney General were named in their official capacities. Tropicana also named as a Third–Party Defendant James R. Hurley ("Hurley"), in his official capacity as Chairperson of the New Jersey Casino Control Commission ("CCC"). The CCC was created pursuant to the New Jersey Casino Control Act ("the Act"), N.J.S.A. § 5:12–1 *et seq.* The Act, which took effect on June 2, 1977, legalized casino gambling in Atlantic City, New Jersey. *Id.* The Commission has promulgated regulations which, *inter* alia, require each casino licensee to adopt an approved affirmative action plan, the EE-BOP. N.J.A.C. § 19:53–6.1.

Tropicana filed the Third–Party Complaint against the State and NJCCC Defendants because it alleges that "to the extent that any portion of [Tropicana's] EEBOP contained or caused affirmative action that was in any way unlawful, such action was instituted solely because it was

1. New Jersey Administrative Code § 19:53–6.1 sets forth a description of the EEBOPs as follows:

**19:53–6.1 Equal Employment and Business Opportunity Plan(EEBOP); purpose and basic elements**

(a) In order to insure compliance with the requirements of section 134 of the Act and this chapter, each casino licensee and applicant shall be required to submit an Equal Employment and Business Opportunity Plan (EEBOP) to the Commission for its approval. The EEBOP of each casino licensee or applicant shall address in specific terms the strategies, procedures and internal requirements which the casino licensee or applicant intends to implement so that the equal employment opportunity, equal business opportunity and affirmative action objectives and goals of the Act and this chapter are achieved, both on a current and continuing basis.

(b) Each casino licensee or applicant shall be encouraged to use imagination and innovation in the development of its EE-BOP. Although, in general, no particular format will be required, every EEBOP prepared by a casino license applicant shall include Sections, at a minimum, addressing the first three basic subject matter areas listed below, and every EE-BOP prepared by a casino licensee shall contain sections addressing each of the following areas:

1. General regulatory requirements;
2. Construction requirements;
3. Operations work force requirements; and
4. Business requirements.

(c) The EEBOP of a casino license applicant which will be building or substantially renovating a casino hotel facility prior to licensure shall address:

1. All phases of the development of the project including planning and feasibility studies in preparation for initial construction; and
2. The qualifications of the Equal Opportunity Officer to perform the duties set forth in N.J.A.C. 19:53–1.4.

required by the [New Jersey Casino Control] Act and its implementing regulations." State's Br. at 2. Specifically, Tropicana alleges that the portions of the New Jersey Casino Control Act and its implementing regulations, which require casinos to develop and implement EEBOPs, violate 42 U.S.C. § 1981 (Count I), 42 U.S.C. § 1983, the United States Constitution, and the New Jersey Constitution (Count II), and the New Jersey Law Against Discrimination (Count III). With respect to Counts I, II, and III, Tropicana seeks declaratory and injunctive relief, reimbursement of reasonable attorneys' fees, and reimbursement for all equitable relief, including damages and attorneys' fees, obtained against Tropicana by Plaintiff or the plaintiff class. Tropicana also alleges, in Count IV, a claim for common law indemnification and for contribution pursuant to the New Jersey Joint Tortfeasors Contribution Act, N.J.S.A. § 2A:53A–1 *et seq.*

On March 15, 2000, Plaintiff filed claims against the Third–Party Defendants pursuant to Federal Rule of Civil Procedure 14(a).[2] Plaintiff's Rule 14(a) Complaint alleges that Tropicana's state-mandated EEBOP caused the alleged violations of Plaintiff's rights under 42 U.S.C. § 1981 (Count I), § 1983 (Count II), the NJLAD (Count III), and the New Jersey Constitution (Count IV). Plaintiff seeks declaratory and injunctive relief, compensatory and punitive damages, and costs and fees.

Two motions are now before the Court. First, the State Defendants have moved to dismiss all claims against them pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), except the Plaintiff's and Third–Party Plaintiff's claims against the Governor and the Attorney General which seek prospective, injunctive relief under federal law. Second, Commissioner Hurley has moved to dismiss all claims brought against him in his official capacity on the ground that the NJCCC is an arm of the State of New Jersey and is therefore entitled to Eleventh Amendment immunity.

I shall grant the State Defendants' unopposed motion to dismiss all claims against the State of New Jersey on the grounds of Eleventh Amendment immunity. Additionally, for the reason set forth below, I shall grant the State Defendants' motion to dismiss Tropicana's claims for contribution, indemnification, or statutory entitlement pursuant to 42 U.S.C. § 1988, for Plaintiff's attorneys' fees which may be assessed against Tropicana if Plaintiff prevails against Tropicana in the underlying litigation. Furthermore, I shall grant the State Defendants' motion to dismiss Plaintiff's and Tropicana's claims against the State Defendants for damages under the NJLAD.

With respect to Commissioner Hurley's motion, I shall grant his motion to dismiss the claims against him, with the exception

---

**2.** Fed.R.Civ.P. 14(a) provides, in relevant part, as follows:

(a) When Defendant May Bring in Third Party. At any time after commencement of the action a defending party, as a third-party plaintiff, may cause a summons and complaint to be served upon a person not a party to the action who is or may be liable to the third-party plaintiff for all or part of the plaintiff's claim against the third-party plaintiff ... *The*

*plaintiff may assert any claim against the third-party defendant arising out of the transaction or occurrence that is the subject matter of the plaintiff's claim against the third-party plaintiff, and the third-party defendant thereupon shall assert any defenses as provided in Rule 12 and any counterclaims and cross-claims as provided in Rule 13 ...* (emphasis added). Fed.R.Civ.P. 14(a).

of the claims for prospective, injunctive relief under federal law.

## III. JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 [3] and 1367(a).[4]

## IV. LEGAL STANDARDS GOVERNING MOTIONS TO DISMISS

Federal Rule of Civil Procedure 12(b)(1) governs a district court's ability to dismiss a claim for lack of subject matter jurisdiction. *Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1408–09 (3d Cir.1991), *cert. denied,* 501 U.S. 1222, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991). "When the subject matter jurisdiction of the court is challenged, the party that invokes the court's jurisdiction bears the burden of persuasion." *Lumbermans Mutual Casualty Co. v. Fishman,* 1999 WL 744016 at *3 (E.D.Pa.1999) (citing *Kehr Packages, Inc.,* 926 F.2d at 1409).

Federal Rule of Civil Procedure 12(b)(6) governs motions to dismiss for failure to state a claim upon which relief may be granted. "In considering a Rule 12(b)(6) motion, the Court may dismiss a complaint if it appears certain the plaintiff cannot prove any set of facts in support of its claims which would entitle it to relief." *Mruz v. Caring, Inc.,* 39 F.Supp.2d 495, 500 (D.N.J.1999) (Orlofsky J.) (citing *Ransom v. Marrazzo,* 848 F.2d 398, 401 (3d Cir.1988)). "While all well-pled allegations are accepted as true and reasonable inferences are drawn in the plaintiff's favor, the Court may dismiss a complaint where, under any set of facts which could be shown to be consistent with a complaint, the plaintiff is not entitled to relief." *Id.* (citing *Gomez v. Toledo,* 446 U.S. 635, 636, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980); *Schrob v. Catterson,* 948 F.2d 1402, 1405 (3d Cir. 1991); *Markowitz v. Northeast Land Co.,* 906 F.2d 100, 103 (3d Cir.1990)); *see also Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Finally, Rule 12(b)(6) authorizes a court to dismiss a claim on a dispositive issue of law. *Mruz,* 39 F.Supp.2d at 500 (citing *Neitzke v. Williams,* 490 U.S. 319, 326–2, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989)).

With these legal standards in mind, I shall examine first the State Defendants' motion to dismiss, and then Commissioner Hurley's motion.

## V. CLAIMS AGAINST THE STATE DEFENDANTS

### A. Eleventh Amendment Immunity

■ The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const., Amdt. XI. The Eleventh Amendment operates as a limitation on the

---

**3.** This section provides, in relevant part, as follows: "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.

**4.** This section provides, in relevant part, as follows:

(a) Except as provided in subsections (b) and (c), or as expressly provided otherwise by Federal Statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims un te action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367.

subject matter jurisdiction which may be exercised by federal courts. *See Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 119–20, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). Specifically, the Eleventh Amendment has been interpreted to bar suits against any state in federal court by that state's own citizens as well as suits by citizens of other states. *See Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Hans v. Louisiana,* 134 U.S. 1, 15, 10 S.Ct. 504, 33 L.Ed. 842 (1890).

■ The Supreme Court addressed the application of Eleventh Amendment immunity to suits brought against state officials under 42 U.S.C. § 1983 in *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). In *Will,* the Court held that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983," and that therefore, such defendants are immune from suit under § 1983. *Will,* 491 U.S. at 71, 109 S.Ct. 2304. The Supreme Court, however, recognized an exception to its holding in *Will:* "Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'" *Id.* 491 U.S. at 71, n. 10, 109 S.Ct. 2304 (citing, *inter alia, Ex Parte Young,* 209 U.S. 123, 159–60, 28 S.Ct. 441, 52 L.Ed. 714 (1908)).

Citing *Will,* the Third Circuit has explained this distinction as follows:

> When state officials are sued in their official capacities for damages, that suit is treated as one against the state and the official is not considered to be a "person." Hence, § 1983 cannot be invoked.... A suit for damages must be contrasted with a suit for equitable relief. The Supreme Court has held that a state official sued for injunctive relief is a "person" under § 1983, because an action for prospective relief is not treated as an action against the state.

*Powell v. Ridge,* 189 F.3d 387, 401 (3d Cir.1999), *cert. denied sub nom.,* 528 U.S. 1046, 120 S.Ct. 579, 145 L.Ed.2d 482 (1999).

Both the Plaintiff and the Third–Party Plaintiff have asserted claims based on federal and New Jersey state law against the State Defendants. With respect to the claims asserted by both parties, the State Defendants argue that they are entitled to Eleventh Amendment immunity and therefore to the dismissal of all claims against them, with the exception of the federal claims brought against the Governor and the Attorney General, in their official capacities, for prospective injunctive relief.[5]

The Third–Party Plaintiff, Tropicana, concedes that the State itself is immune from suit. Tropicana, however, contends that this Court has jurisdiction not only

**5.** The State Defendants originally moved to dismiss Plaintiff's claims for declaratory and injunctive relief, based on the State Defendants' contention that the Plaintiff had failed to show that he had standing to pursue these claims. *See* State Defs.' Br. at 24–30. At oral argument, however, counsel for the State Defendants agreed that Plaintiff could cure this defect by amending his complaint and filing an amended affidavit in which he stated that he was actively seeking employment in the casino industry. Transcript, Oral Argument, November 29, 2000, at 32. Plaintiff has since filed a Second Amended Complaint and an Affidavit which attests to the fact that he is continuing to search for employment in the casino industry, thereby satisfying the standing requirement. *See* Second Amended Compl.; *see also* Rudolph Affidavit, December 6, 2000. Accordingly, I need not consider the State Defendants' motion to dismiss, for lack of standing, the portions of Plaintiff's Rule 14(a) Complaint which seek prospective injunctive relief for alleged violations of federal law.

over its federal claims against the Governor and Attorney General for prospective injunctive relief, but also over Tropicana's claims for attorneys' fees pursuant to 42 U.S.C. § 1988. Tropicana argues that it is both entitled to recover its own reasonable attorneys' fees, and to be indemnified or receive contribution for any attorneys' fees that might be awarded to Plaintiff or the plaintiff class. Furthermore, Tropicana contends that while the State Defendants may be immune from suit under federal law, they are not immune from suit under the NJLAD, nor are they immune from suit under the New Jersey Tort Claims Act. The Plaintiff incorporates Tropicana's arguments on the issues of damages recoverable by the plaintiff class and the applicability of federal and state immunities from suit. *See* Pl.'s Opp. Br. at 1.

Because the State Defendants' motion to dismiss all federal claims brought by Tropicana and the Plaintiff against the State of New Jersey is effectively unopposed, I shall grant this part of the State Defendants' motion. Accordingly, Counts I and II of the Third–Party Complaint, and Counts I and II of the Plaintiff's Rule 14(a) claim, shall be dismissed with respect to the State of New Jersey.

The State Defendants have not moved to dismiss Tropicana's claims against the Governor and Attorney General for prospective injunctive relief under federal law. *See* Notice of Motion, May 26, 2000. Furthermore, the Plaintiff has cured, through the filing of an amended complaint and affidavit, the standing defect upon which the State Defendants based their motion to dismiss Plaintiff's request for prospective, injunctive relief. *See* Second Amd. Compl., Rudolph Aff. Accordingly, both the Plaintiff and Tropicana are entitled to proceed with the portions of Counts I and II of their respective complaints, which request prospective, injunctive relief under federal law.

The State Defendants do not contest Tropicana's right to seek reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988, in the event Tropicana succeeds on its claim for prospective, injunctive relief against the State Defendants. State Defs.' Reply Br. at 7. Accordingly, Tropicana may also proceed with Counts I and II of the Third Party Complaint as to an award of reasonable attorneys' fees, should Tropicana prevail in its suit against the State Defendants, pursuant to 42 U.S.C. § 1988.

■ Finally, I note that the State Defendants argue that they are entitled to qualified immunity against Tropicana's and the Plaintiff's claims for damages. Qualified immunity, however, is a defense which may be properly asserted only by a state official sued in his or her *personal* or *individual,* as opposed to *official,* capacity. In a case in which it observed that the distinction between personal- and official-capacity action suits "apparently continues to confuse lawyers and confound lower courts," the Supreme Court explained the distinction as follows:

> When it comes to defenses to liability, an official in a personal capacity action may, depending on his position, be able to assert personal immunity defenses, such as objective reasonable reliance on existing law. *See Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) (absolute immunity); *Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967) (same), *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (qualified immunity), *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975) (same).[ ] The only immunities that can be claimed in an official-capacity action are forms of sovereign immunity that the entity, *qua* entity, may possess, such

as the Eleventh Amendment. While not exhaustive, this list illustrates the basic distinction between personal- and official-capacity actions.

*Kentucky v. Graham,* 473 U.S. 159, 166–67, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). Both the Plaintiff and the Third–Party Plaintiff in this case brought their complaints against the Governor, now Acting Governor Donald T. DiFrancesco, and the Attorney General, John J. Farmer, Jr., Esq., in their *official capacities only. See* Third Party Complaint (naming as defendants "Christine Todd Whitman, in her official capacity of Governor of the State of New Jersey; John J. Farmer, Jr., in his official capacity as Attorney General of the State of New Jersey"); Plaintiff's Rule 14(a) Complaint (same). Based upon the Supreme Court's holding in *Kentucky v. Graham,* then, the only applicable immunity which must be addressed by this Court is the availability of Eleventh Amendment immunity. The question of whether the Defendants are entitled to assert qualified immunity is not presented and need not be addressed by this Court.

To summarize, there are two questions this Court must address to resolve the State Defendants' pending motion. The first is whether Tropicana, to the extent that it seeks to recover Plaintiff's attorneys' fees awarded against it, under either § 1988 or common law, has failed to state a claim upon which relief may be granted pursuant to Fed.R.Civ.P. 12(b)(6). The second is whether this Court has subject matter jurisdiction over Tropicana's and the Plaintiff's claims against the State Defendants for damages based on alleged violations of state law, namely, the NJLAD.

## B. The State Defendants' Potential Liability to Tropicana for Plaintiff's Attorneys' Fees

Tropicana has set forth two theories pursuant to which it claims the State Defendants may be liable to it for Plaintiff's attorneys' fees, if such fees are awarded to Plaintiff against Tropicana. First, Tropicana argues that it is entitled by statute to recover Plaintiff's fees, pursuant to the terms of 42 U.S.C. § 1988. In the alternative, Tropicana claims it is entitled to recover Plaintiff's attorneys' fees from the State Defendants based on common law principles of contribution and indemnification.

With respect to Tropicana's statutory argument, I note that pursuant to 42 U.S.C. § 1988, the "prevailing party" in a civil rights action may be entitled to recover a reasonable attorney's fee as part of the costs. Section 1988(b) provides, in relevant part, as follows:

> In any action or proceeding to enforce a provision of sections 1981 ... 1983[ ], the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs ...

42 U.S.C. § 1988. According to the Third Circuit, "[t]he purpose of [42 U.S.C. § 1988] is to ensure effective access to the judicial process for persons with civil rights claims, and to encourage litigation to enforce the provisions of the civil rights acts and constitutional civil rights provisions." *Hernandez v. Kalinowski,* 146 F.3d 196, 199 (3d Cir.1998).

It is undisputed that, pursuant to the terms of 42 U.S.C. § 1988, the State Defendants may be liable to Tropicana for Tropicana's attorneys' fees if Tropicana ultimately prevails against the State Defendants on its remaining federal claims, namely, its claims for prospective, injunctive relief based on alleged violations of 42 U.S.C. §§ 1981 and 1983. Similarly, it is undisputed that the State Defendants may be liable to Plaintiff, for Plaintiff's attor-

ney's fees, if Plaintiff ultimately prevails against the State Defendants on the remaining federal claim in his Rule 14(a) Complaint, for prospective, injunctive relief for alleged violations of 42 U.S.C. §§ 1981 and 1983.

Tropicana asserts, however, that the State Defendants may also be liable to it for the Plaintiff's attorneys' fees, pursuant to § 1988, should the Plaintiff prevail against Tropicana in the underlying litigation. While the Court is not unsympathetic to the rationale underlying Tropicana's request, the plain language of 42 U.S.C. § 1988 precludes this claim. Section 1988 allows the *"prevailing party"* in civil rights litigation to recover attorneys' fees and costs. 42 U.S.C. § 1988 (emphasis added). If Tropicana is liable to the Plaintiff for attorneys' fees in his suit against Tropicana, it will be because the Plaintiff, not Tropicana, was the "prevailing party" in that litigation. In that event, Tropicana, as the *losing* party, cannot invoke the attorneys' fees provision of § 1988, either against the Plaintiff or against the State Defendants.

Alternatively, Tropicana argues that it is entitled to recover any attorneys' fees Plaintiff is awarded against Tropicana from the State Defendants, on the basis of theories of indemnification and contribution grounded in "federal common law." The State Defendants argue that such "federal common law" claims are barred by the Eleventh Amendment.

To support its claim for indemnification, Tropicana relies on *Alexander v.*

*Hargrove,* 1994 WL 444728 (E.D.Pa.1994), and *In re Sunrise Securities Litigation,* 793 F.Supp. 1306, 1317 (E.D.Pa.1992). Tropicana's reliance on these cases, however, is misplaced. Tropicana cites the following passage from *Alexander* to support its position:

> Under federal common law, indemnity may be allowed where the indemnitee was induced to act by an actual misrepresentation of the indemnitor on which the indemnitee relied or where he acted pursuant to directions of the indemnitor which the indemnitee reasonably believed to be lawful.

*Alexander,* 1994 WL 444728 at *5 (quoting *In re Sunrise Securities Litigation,* 793 F.Supp. at 1317 (E.D.Pa.1992)). *Alexander,* however, involved cross-claims which were asserted against employees and agents of the Pennsylvania Department of Banking in their *individual capacities only. See Alexander* at * 1, n. 1. As the court in *Alexander* noted, the United States Supreme Court has held that the Eleventh Amendment is inapplicable to state officers sued in their individual capacities. *Alexander* at n. 1 (citing *Hafer v. Melo,* 502 U.S. 21, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991)). No such restriction on the availability of Eleventh Amendment immunity exists when the state officers are, as in this case, sued in their *official* capacities, because the state, in an official-capacity suit, is recognized as the real party in interest. *See Kentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985).[6]

6. In *Kentucky v. Graham,* the Supreme Court explained the distinction between suits brought against state officials in their "personal" or "individual" capacities, and those brought against state officials in their "official" capacities:

> Official-capacity suits ... generally represent only another way of pleading an action

against an entity of which an officer is an agent. *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 690, n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the

Tropicana's reliance on *In re Sunrise Securities Litigation* is similarly unavailing. *In re Sunrise Securities Litigation* involved cross-claims for contribution and indemnity brought by settling defendants against non-settling defendants in securities fraud litigation. *In re Sunrise Securities Litigation*, 793 F.Supp. at 1310 and n. 4. The court held that the non-settling defendants could pursue an action for indemnification against the settling defendants under federal common law. *Id.* at 1317. All parties involved in the cross-claims, however, were private individuals and entities; neither the State nor any state agent or official was involved. *Id.* at 1310, n. 4.

Tropicana's argument that it is entitled to contribution for attorneys' fees which may be awarded to Rudolph against Tropicana is similarly flawed. To support this argument, Tropicana relies primarily on the Third Circuit's holding in *Miller v. Apartments and Homes of N.J., Inc.*, 646 F.2d 101, 106 (3d Cir.1981). *Miller* involved a housing discrimination suit brought by a white woman and her African–American husband against their rental broker, the brokerage he worked for, the superintendent of an apartment building which denied their application for rental, the corporation which owned the apartment building, and the man who owned both the brokerage agency and apartment building. *Id.* at 104. Prior to trial, the plaintiffs settled their claims against the apartment brokerage and the broker. After a trial in which damages were assessed against the non-settling defendants, the court concluded that the non-settling defendants were entitled to a *pro tanto* reduction of the damages award based on

the settling defendants' contribution. The non-settling defendants appealed, contending they were entitled to a *pro rata* reduction. The court held that federal common law, as opposed to New Jersey state law, "determines the availability of contribution in a federal civil rights suit." *Id.* 108. Like *In re Sunrise Securities Litigation*, then, *Miller* did not involve litigation against the State or state agents or employees; therefore, its holding that federal common law allows contribution in civil rights cases is inapposite to Tropicana's claim for contribution in this litigation against the State of New Jersey and its officials. Tropicana also cites *Fishman v. De Meo*, 604 F.Supp. 873, 875–77 (E.D.Pa. 1985). That case, which involved a cross-claim for indemnification brought by the Republican City Committee against its co-defendant, the City of Philadelphia, in a wrongful termination case, likewise did not involve State defendants or implicate Eleventh Amendment immunity.

█ In sum, the mere fact that the remedies of indemnification and contribution may be available at federal common law does not affect, much less abrogate, the State Defendants' right to Eleventh Amendment immunity in this case. While Tropicana is quick to point out that attorneys' fees sought under 42 U.S.C. § 1988 are not considered damages, and therefore states cannot avoid paying attorneys' fees under § 1988 based on Eleventh Amendment immunity, Tropicana glosses over the fact that the attorneys' fees in question are not its *own* fees for pursuing this litigation against the State Defendants, but rather, Rudolph's fees for pursuing this litigation against Tropicana. Tropicana cannot avoid the Eleventh Amendment by disguis-

---

entity. *Brandon, supra*, 469 U.S. at 471–472, 105 S.Ct. 873. It is *not* a suit against the official personally, for the real party in interest is the entity.

*Kentucky v. Graham*, 473 U.S. at 165, 105 S.Ct. 3099 (emphasis in original).

ing its claim for Rudolph's attorneys' fees, which may be obtained against Tropicana as the *losing party*, as a § 1988 claim for attorneys' fees by a *prevailing party* in civil rights litigation. Rather, Tropicana's claim for indemnification for attorneys' fees which may potentially be awarded against it to Rudolph, is in actuality a claim for damages against the State Defendants. *See Vargas v. Hudson County Board of Elections, et al.,* 949 F.2d 665, 670 (3d Cir.1991) (in case where defendants sought recovery of class plaintiffs' attorneys' fees from third-party defendant, insurer, prospective fee award was properly considered damages and not entitlement based on status as prevailing party in litigation). Because the State Defendants were sued in their official capacities, as opposed to their individual or personal capacities, the State of New Jersey is the real party in interest and Eleventh Amendment immunity is implicated. *Kentucky v. Graham,* 473 U.S. at 165, 105 S.Ct. 3099; *Holman v. Walls,* 648 F.Supp. 947 (D.Del.1986) (police chief, defendant in § 1983 action brought by children of victim shot by police officers, filed complaint as Third–Party Plaintiff seeking contribution and indemnification from Delaware Council on Police Training for failure to train; court held that claims were barred by Eleventh Amendment). Furthermore, Tropicana, by failing to oppose the State Defendants' motion to dismiss those claims which Tropicana asserted directly against the State of New Jersey, on the grounds of Eleventh Amendment immunity, has implicitly conceded that the Eleventh Amendment bars its damage claims against the State of New Jersey. Because its claim for indemnification for Rudolph's attorney's fees is akin to a claim for damages, this claim, too, is barred by the Eleventh Amendment.

Accordingly, I conclude that Tropicana is not entitled to recover Rudolph's attorneys' fees from the State Defendants, either under § 1988 or under theories of contribution or indemnification grounded in federal common law. Therefore, I shall grant the State Defendants' motion to dismiss Tropicana's claims for Rudolph's attorneys' fees.

## C. The NJLAD Claims

The State Defendants have also moved to dismiss all claims brought against them under the NJLAD. Specifically, the State Defendants contend that: (1) Tropicana's, and the Plaintiff's, claims for prospective, injunctive relief against the State Defendants, to the extent that this claim is based on state law, is barred by the Eleventh Amendment; and (2) Tropicana's, and the Plaintiff's, claim for damages, based on alleged violations of state law, are barred not only by the Eleventh Amendment but also by the immunity provisions of the New Jersey Tort Claims Act.

### 1. Claims for Prospective, Injunctive Relief Under State Law

At the outset, I note that it is unclear from the record before me whether Tropicana opposes the State Defendants' motion to dismiss its claim for prospective, injunctive relief against state officials based on state law. This claim may, however, be resolved in short order, because the United States Supreme Court has clearly spoken on this issue. In *Pennhurst v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), the Supreme Court held:

[When a plaintiff alleges that a state official has violated state law], the entire basis for the doctrine of *Young* and *Edelman* disappears. A federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law. On

the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment. We conclude that *Young* and *Edelman* are inapplicable in a suit against state officials on the basis of state law.

*Pennhurst,* 465 U.S. at 106, 104 S.Ct. 900. According to the plain language of the Court's holding in *Pennhurst,* this Court is precluded from considering either Tropicana's or the Plaintiff's claims for prospective injunctive relief against the State Defendants for asserted violations of state law. Accordingly, the State Defendants' motion to dismiss these claims shall be granted.

### 2. Claims for Damages Under State Law

The State Defendants assert that they are immune from Plaintiff's and Tropicana's suit for damages, based on alleged violations of state law, specifically, the NJLAD, under both the Eleventh Amendment and the New Jersey Tort Claims Act.

Beginning with the Eleventh Amendment argument, the State Defendants contend that the State of New Jersey has not expressly waived its Eleventh Amendment immunity with respect to the NJLAD. Tropicana responds by pointing out first, that since this Court has federal question jurisdiction over the § 1981 and § 1983 claims, pursuant to 28 U.S.C. § 1331, it is undisputed that this Court therefore also has pendent jurisdiction over supplemental

state law claims, which "are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1967(a). The Court therefore has jurisdiction over the NJLAD claim. Second, Tropicana notes that the State of New Jersey has expressly waived its sovereign immunity and consented to be sued under the NJLAD.[7] Third, Tropicana notes that "federal courts often adjudicate LAD claims against New Jersey state agencies without challenge by the State to federal jurisdictional [sic] based on claimed sovereign immunity." Tropicana Br. at 16. According to Tropicana, then, since the State has waived its sovereign immunity and consented to be sued under the NJLAD, the State has therefore also waived its Eleventh Amendment immunity with respect to suits brought under the NJLAD in federal court. For the reasons I shall now set forth, Tropicana's argument, while creative, must be rejected.

The Third Circuit has plainly stated that "there are two ways to divest a state of its Eleventh Amendment immunity, and hale the state into federal court. First, a state may waive its Eleventh Amendment immunity and consent to suit in federal court. Second, Congress can abrogate a state's immunity[.]" *In re Sacred Heart Hospital of Norristown v. Commonwealth of Pennsylvania,* 133 F.3d 237, 242 (1998). Clearly, Tropicana's argument is directed towards the first of these possibilities. The question under the NJLAD is whether the State's consent to be sued for discriminating under the NJLAD as an "employer,"

---

**7.** *See* N.J.S.A. § 10:5–12(a) (stating that is unlawful for any employer to refuse to hire or employ an individual based, *inter alia,* on that individual's race, creed, color, national origin, or ancestry); N.J.S.A. § 10:5–12(c) (stating that it is unlawful for any employer to directly or indirectly express limitations, spec- ifications or discrimination in hiring preferences based on these criteria); and N.J.S.A. § 10:5–5 (defining "employer" and noting that "employer" includes "the State, any political or civil subdivision thereof, and all public officers, agencies, boards or bodies").

N.J.S.A. § 10:5–12(a), (c), or for aiding, abetting, inciting, compelling, or coercing such discrimination, N.J.S.A. § 10:5–12(e), is tantamount to a waiver of its Eleventh Amendment immunity against being sued in federal court.

■ The State Defendants contend that because the text of the NJLAD does not contain language expressly waiving the State's Eleventh Amendment immunity from suit in federal court under that statute, the State has not waived this immunity, and the State Defendants may invoke it as a defense in this case. This view is supported by the Supreme Court's holding in *Port Auth. Trans–Hudson Corp. v. Feeney*, 495 U.S. 299, 110 S.Ct. 1868, 109 L.Ed.2d 264 (1990), in which the Court stated:

> The Court will give effect to a State's waiver of Eleventh Amendment immunity "only where stated by the most express language or by such overwhelming implication from the text as [will] leave no room for any other reasonable construction." *Atascadero State Hospital, supra,* 473 U.S. at 239–240, 105 S.Ct. 3142 (quoting *Edelman v. Jordan,* 415 U.S. 651, 673, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) (internal quotation omitted)). A State does not waive its Eleventh Amendment immunity by consenting to suit only in its own courts, *see, e.g., Florida Dept. of Health and Rehabilitative Services v. Florida Nursing Home Assn.,* 450 U.S. 147, 150, 101 S.Ct. 1032, 67 L.Ed.2d 132 (1981) (per curiam), and "[t]hus, in order for a state statute or constitutional provision to constitute a waiver of Eleventh Amendment immunity, it must specify the State's intention to subject itself to suit in federal court." *Atascadero State Hospital, supra* 473 U.S. at 241, 105 S.Ct. 3142.

*Port Auth. Trans–Hudson Corp. v. Feeney,* 495 U.S. 299, 305–306, 110 S.Ct. 1868, 109 L.Ed.2d 264. (1990). Neither Tropicana nor the Plaintiff has cited any portion of the text of the NJLAD which addresses, much less expressly waives, the State's Eleventh Amendment immunity, nor can this Court find any such reference in the text of the NJLAD.

Nevertheless, Tropicana argues that because federal courts have previously, without objection by the State, adjudicated pendent claims brought against State agencies under the NJLAD in federal court, the State has waived immunity under the NJLAD and should be precluded from raising the Eleventh Amendment as a defense to the NJLAD claims in this case. To support this argument, Tropicana cites numerous cases in which federal courts have adjudicated claims brought against the State of New Jersey under the NJLAD without even considering the issue of Eleventh Amendment immunity. Closer examination of these cases reveals, however, that three of them involved claims brought against the State in its capacity as an employer, and the court declined to exercise pendent jurisdiction over the state claims raised in the fourth case.

For example, *Motley v. New Jersey State Police,* 196 F.3d 160 (3d Cir.1999), *cert. denied,* 529 U.S. 1087, 120 S.Ct. 1719, 146 L.Ed.2d 641 (2000), a case recently decided by the Third Circuit, involved allegations brought by a former state trooper against his employer, the New Jersey State Police, alleging failure to promote him due to his physical handicap in violation of the Americans with Disabilities Act ("ADA") and the NJLAD. *Lanni v. State of New Jersey,* 177 F.R.D. 295 (D.N.J. 1998) (Hughes, Mag. J.) also involved a disability discrimination lawsuit brought under the ADA and NJLAD by a state employee against his employer, in that case the New Jersey Department of Environmental Protection, Division of Fish,

Game, and Wildlife. Similarly, in *Floyd v. State of New Jersey*, 1991 WL 274239 (D.N.J.1991) (Fisher, J.), a state employee sued his employer, the New Jersey Department of Human Services, for discrimination on the basis of race and gender in violation of N.J.S.A. § 11A:7–1.[8]

The final case cited by Tropicana is *McKay v. Horn*, 529 F.Supp. 847 (D.N.J.1981)(Debevoise, J.). *McKay* involved claims brought by individuals whose unemployment benefits were limited by amendments to state and federal law. Plaintiffs, who sued both state and federal officials, alleged that the amendments violated state and federal rights, including the NJLAD's prohibition on discrimination on the basis of age. Had the state claims been fully addressed, the court's opinion in *McKay* might have provided guidance in the present matter; however, having dismissed plaintiffs' federal claims, the court in *McKay* declined to exercise pendent jurisdiction over the state claims and summarily dismissed them. *McKay*, 529 F.Supp. at 866.

In short, not one of these cases supports the proposition that the State of New Jersey has expressly waived its Eleventh Amendment immunity under the NJLAD and consented to be sued on a claim brought under state law against the state, *qua* state, in federal court. In *Motley*, *Lanni*, and *Floyd*, the State was sued in its capacity as an employer. *See Motley*, 196 F.3d at 162; *Lanni*, 177 F.R.D. at 298; *Floyd*, 1991 WL 274239 at * 2. Suits brought against the State as an employer are clearly within the scope of the explicit waiver of sovereign immunity contained in N.J.S.A. § 10:5–5(e); §§ 10:5–12(a),(c). While Tropicana alleges in its Complaint that the "State of New Jersey is a *de facto* employer under the LAD for the purposes of employment decisions made pursuant to" the EEBOP, it did not brief this argument. This Court can find no case which suggests that the State, by virtue of its regulation by statute of various aspects of employment, may be considered the *de facto* employer of all employees subject to, or otherwise affected by the State's regulation, and Tropicana has cited to none.

Instead, Tropicana is apparently relying on another provision of the NJLAD's prohibition on discrimination, which makes it unlawful for "any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this act, or to attempt to do so." N.J.S.A. § 10:5–12(e). Essentially, Tropicana argues that the State compelled it to discriminate against the Plaintiff by forcing it to adopt an EEBOP, and that the State, pursuant to N.J.S.A. § 10:5–12(e) has waived its immunity to suits brought against it in its capac-

---

**8.** This statute provides, in relevant part, as follows:

> The head of each State agency shall ensure equality of opportunity for all of its employees and applicants seeking employment. Equal employment opportunity includes, but is not limited to, the following areas: recruitment, selection, hiring, training, promotion, transfer, layoff, return from layoff, compensation and fringe benefits. Equal employment opportunity further includes policies, procedures, and programs for recruitment, employment, training, promotion, and retention of minorities, women

> and handicapped persons. Equal employment opportunity but not affirmative action is required with respect to persons identified solely by their affectional or sexual orientation.
>
> The head of each State agency shall explore innovative personnel policies in order to enhance these efforts and where appropriate shall implement them to the fullest extent authorized. Where the implementation of those policies is not authorized, an agency head shall recommend implementation to the appropriate State agency. N.J.S.A. § 11A:7–1.

ity as a aidor, abettor, compeller or coercer of discrimination.

To support this argument, Tropicana cites the Third Circuit's opinion in *Presbytery of New Jersey of the Orthodox Presbyterian Church v. Whitman*, 99 F.3d 101 (3d Cir.1996), *cert. denied*, 520 U.S. 1155, 117 S.Ct. 1334, 137 L.Ed.2d 494 (1997). *Presbytery of New Jersey* involved a suit brought by the governing body of a church against the State, seeking a declaratory judgment that the NJLAD's prohibition on discrimination based on sexual orientation was impermissibly overbroad. *Id.* at 103. The church challenged the constitutionality of the prohibition both on its face and as applied. In finding that the prohibition was not unconstitutional on its face, the Third Circuit noted that "a person who threatened a business if it refused to fire its gay employees could certainly be held liable as a 'coercer' under the Law Against Discrimination without offending the Speech Clause." *Id.* at 105. The Third Circuit's language in *Presbytery of New Jersey*, a case which involved a First Amendment challenge to the NJLAD, simply does not apply to the facts, or the law, of this case.

This Court can find no other reported decision which construes the "compel or coerce" language of N.J.S.A. § 10:5–12(e). Courts have, however, frequently construed the portion of that statute which addresses aiding or abetting discrimination. *See* N.J.S.A. § 10:5–12(e). The majority of these cases involved the potential individual liability of an employee who knowingly aids or abets discrimination perpetrated by his employer. *See, e.g., Hurley v. Atlantic City Police Dep't*, 174 F.3d 95, 126 (3d Cir.1999), cert. denied, 528 U.S. 1074, 120 S.Ct. 786, 145 L.Ed.2d 663 (2000); *Santiago v. Vineland*, 107 F.Supp.2d 512 (D.N.J.2000)(Orlofsky, J.); *Newsome v. Administrative Office of Courts of State of New Jersey*, 103 F.Supp.2d 807 (D.N.J.2000) (Greenaway, J.); *Mobley v. City of Atlantic City Police Dep't*, 89 F.Supp.2d 533 (D.N.J.1999)(Simandle, J.). After surveying the cases which have construed the "aiding or abetting" language of N.J.S.A. § 10:5–12(e), I conclude that not one of these cases addresses whether the State intended to waive its Eleventh Amendment immunity and consent to be sued in federal court for actions undertaken in its legislative capacity, for enacting the NJLAD, or its executive capacity, for enforcing it.

In the absence of either statutory language or case law which address this question in the specific context of the NJLAD, I shall look beyond the NJLAD for guidance. Pursuant to the terms of N.J.S.A. § 59:2–4, "[a] public entity is not liable for any injury caused by adopting or failing to adopt a law or failing to enforce any law." N.J.S.A. § 59:2–4. While this statute is part of the New Jersey Tort Claims Act, "rules of statutory construction require statutes to be interpreted in *pari materia*, to give full [e]ffect to the legislative intent." *Monmouth County Div. of Social Serv. v. C.R.*, 316 N.J.Super. 600, 607, 720 A.2d 1004 (1998). This Court finds it inconceivable that the legislature of New Jersey intended to waive the State's Eleventh Amendment immunity under the NJLAD and allow the State to be sued in federal court in its legislative or executive capacities, while expressly reserving its immunity in these capacities under the New Jersey Tort Claims Act.

I note that this conclusion is in accord with the conclusion reached by the only other federal court which has specifically considered the question of pendent jurisdiction over claims against state defendants based on state law brought in federal court. *See Davis v. Kansas City Housing Authority*, 822 F.Supp. 609 (W.D.Mo.1993). As in this case, plaintiffs

in *Davis* asserted claims based on both federal and state anti-discrimination law; in *Davis*, the relevant state law was the Missouri Human Rights Act. *Id.* at 612. In *Davis*, the court concluded simply that "there can be no pendent jurisdiction where the Eleventh Amendment is applicable." *Id.* at 620.

Based on my review of the language of the NJLAD and the case law applying it, I conclude that the State's waiver of sovereign immunity for the purposes of the NJLAD is not tantamount to, nor can it overcome, the State's assertion of Eleventh Amendment immunity in this case. In the absence of any statute or case law which supports Tropicana's position, the Court must reject Tropicana's argument that the State's waiver of sovereign immunity to be sued in its capacity as an employer under the NJLAD, is tantamount to a waiver of its Eleventh Amendment immunity to be sued in its legislative and executive capacities in federal court. Accordingly, I shall grant the State's Defendants' motion to dismiss Tropicana's and the Plaintiff's claims for damages under the NJLAD.

## VI. CCC COMMISSIONER HURLEY'S MOTION TO DISMISS

### A. The Applicability of the Eleventh Amendment to the CCC

In addition to suing the State of New Jersey, Plaintiff and Third-Party Plaintiff have also alleged complaints against James Hurley, the Commissioner of the NJCCC, in his official capacity. Hurley contends, and neither the Plaintiff nor the Third Party Plaintiff dispute, that a suit brought against him in his official capacity is legally equivalent to a suit brought against the NJCCC itself. *See* NJCCC Br. at 5; *see also Kentucky v. Graham,* 473 U.S. 159, 165–67, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). Hurley further contends that the NJCCC is an alter ego of the State of New Jersey and is therefore entitled to the protection of the same Eleventh Amendment immunity enjoyed by the State.

As noted in the preceding analysis of the State Defendants' motion, the Eleventh Amendment's prohibition applies not only to suits against the state itself, but also to suits where "the state is the real, substantial party in interest." *Pennhurst State School & Hosp.,* 465 U.S. at 101–02, 104 S.Ct. 900; *Edelman,* 415 U.S. at 663, 94 S.Ct. 1347. Consequently, the Eleventh Amendment may be applicable to the New Jersey Casino Control Commission. The Eleventh Amendment applies here if the relationship between the New Jersey Casino Control Commission and the State of New Jersey is such that the NJCCC is entitled to be shielded against suit in federal court in the same manner as the State of New Jersey.

▮▮▮▮ In assessing whether an entity is entitled to share in the Eleventh Amendment immunity of a state, the Third Circuit considers three factors: (1) whether payment for any judgment would come from the state; (2) the status of the entity under state law; and (3) what degree of autonomy the entity has. *See Fitchik v. New Jersey Transit Rail Operations, Inc.,* 873 F.2d 655, 659 (3d Cir.1989), *cert. denied,* 493 U.S. 850, 110 S.Ct. 148, 107 L.Ed.2d 107 (1989). These three factors are a composite of the nine factors originally identified by the Third Circuit in *Urbano v. Bd. of Managers of New Jersey State Prison,* 415 F.2d 247 (3d Cir.1969), *cert. denied,* 397 U.S. 948, 90 S.Ct. 967, 25 L.Ed.2d 128 (1970). The entity claiming that it is entitled to share in the Eleventh Amendment immunity of the State, in this case, the NJCCC, bears the burden of proving that it is an alter ego of the state. *See Christy v. Pennsylvania Turnpike Com'n,* 54 F.3d 1140, 1144 (3d Cir.1995).

The Third Circuit has instructed that no single one of these factors is dispositive. *Fitchik*, 873 F.2d at 664. Instead, a court must balance the three factors outlined above to evaluate an entity's contention that it is an arm of the state and therefore entitled to Eleventh Amendment immunity. *Id.*

I note that my colleague, Judge Simandle, United States District Judge for the District of New Jersey, considered this precise question, namely, whether the New Jersey Casino Control Commission is an alter ego of the State for the purposes of Eleventh Amendment immunity, in an unpublished opinion filed last year. *See Young v. State of New Jersey, Casino Control Commission,* Civ. No. 00–0571 (D.N.J. July 27, 2000). *Young* involved a suit brought by an African American man against the State of New Jersey and the Casino Control Commission, in which the plaintiff, alleging that the defendants had violated his federal civil rights by failing to enforce the affirmative action provisions of the Casino Control Act, sought $30 billion in damages. Judge Simandle granted the CCC's motion to dismiss, holding that "as a state agency, the CCC is entitled to all of the protections of the Eleventh Amendment principles of sovereign immunity that would be accorded to the State." *Id.* at 7 (citation omitted). Although the opinion is unpublished, this Court may look to Judge Simandle's holding in *Young* for guidance.

Thus, applying the *Fitchik* factors, I must determine whether the New Jersey Casino Control Commission is entitled to the same immunity from suit in federal court as the State of New Jersey. If the NJCCC is entitled to the same immunity as the State of New Jersey, then, for the reasons set forth in the preceding section of this opinion involving the State Defendants, I must grant Commissioner Hurley's motion to dismiss the Plaintiff's Rule 14(a) Complaint and the Third–Party Complaint. If, however, the NJCCC is not entitled to the same immunity as the State of New Jersey, I must deny Commissioner Hurley's motion and allow the claims against him to proceed.

## B. Application of the *Fitchik* Factors to the CCC

### 1. Funding

█ The first prong of the *Fitchik* analysis requires this Court to consider "[w]hether the money that would pay the judgment would come from the state." *Fitchik*, 873 F.2d at 659. *Id.* The analysis under this prong focuses on "whether payment will come from the state's treasury, whether the agency has the money to satisfy the judgment, and whether the sovereign has immunized itself from responsibility for the agency's debts." *Id.* While, as I noted previously, the Third Circuit has stated that no single factor is dispositive in Eleventh Amendment analysis, the funding factor is the "most important." *Fitchik*, 873 F.2d at 659–60. This is not surprising given that the central purpose of the Eleventh Amendment is to protect state treasuries from having to pay damage awards to satisfy federal judgments. *See generally, Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Ford Motor Co. v. Dept. of the Treasury,* 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945).

Funding for the CCC is controlled by statute. Pursuant to N.J.S.A. §§ 5:12–139,[9] 5:12–140,[10] and 5:12–141,[11] the CCC is financed by fees which the CCC is authorized to collect from casino licensees and

---

**9.** This section provides, in relevant part, as follows:

**Casino License Fees**

a. The commission shall, by regulation, establish annual fees for the issuance or renewal of casino licenses. The issuance fee shall be based upon the cost of inves-

license applicants. N.J.S.A. § 5:12–139b; *see also Atlantic City Casino Hotel Assoc. v. Casino Control Commission,* 203 N.J.Super. 230, 237, 496 A.2d 714 (App. Div.1985), *cert. denied,* 102 N.J. 326, 508 A.2d 205 (1985) (citing N.J.S.A. § 5:12–139b and stating "[t]he Casino Control Act demonstrates a clear legislative intent that the Commission be financed exclusively from fees upon licensees and license applicants who require and benefit from the existence of the regulatory process"). These funds are deposited into a special account established within the Department of Treasury which is called the "Casino Control Fund." N.J.S.A. § 5:12–143.[12] All operating expenses of the Casino Control Commission are paid out of the Casino Control Fund. *Id.* In the event of a budget shortfall, the CCC is authorized to raise the license renewal fee, but under no circumstances may the fees assessed exceed the actual operating costs of the CCC. *Atlantic City Casino Assoc.,* 203 N.J.Super. at 237, 496 A.2d 714.

The CCC is also authorized to impose penalties and collect fines for violations of the Casino Control Act.[13] The funds collected under this authority are deposited into a second special fund at the Depart-

---

tigation and consideration of the license application and shall be not less than $200,000.00. The renewal fee shall be based upon the cost of maintaining control and regulatory activities contemplated by this act and shall be not less than $100,000.00 for a one-year casino license and $200,000.00 for a four-year casino license.

b. The Attorney General shall certify to the commission actual and prospective costs of the investigative and enforcement functions of the division, which costs shall be the basis, together with the operating expenses of the commission, for the establishment of annual license issuance and renewal fees.

c. A nonrefundable deposit of at least $100,000.00 shall be required to be posted with each application for a casino license and shall be applied to the initial license fee if the application is approved N.J.S.A. § 5:12–139.

10. This section provides, in relevant part, as follows:

**License Fee for Slot Machines**

a. In addition to any other tax or fee imposed by this act, there is also hereby imposed an annual license fee of $500.00 upon every slot machine; maintained for use or in use in any licensed casino establishment in this State.

b. License fees imposed under the provisions of this section shall be imposed as of the first day of July of each year with regard to all slot machines maintained for use or in use on that date, and on a pro rata basis thereafter during the year with regard to all slot machines maintained for use or placed in use after July 1.
N.J.S.A. § 5:12–140.

11. This section provides, in relevant part, as follows:

**Fees for other than casino licenses**
The commission shall, by regulation, establish fees for the investigation and consideration of applications for the issuance and renewal of registrations and licenses other than casino licenses, which fees shall be payable by the applicant, licensee or registrant.
N.J.S.A. § 5:12–141.

12. This section provides, in relevant part, as follows:

**Casino Control Fund**

a. There is hereby created and established in the Department of the Treasury a separate special account to be known as the "Casino Control Fund," into which shall be deposited all license fee revenues imposed by sections 139, 140, 141, and 142 of this act.

b. Moneys in the Casino Control Fund shall be appropriated, notwithstanding the provisions of P.L.1976, c. 67 (C. 52:9H–5 *et seq.*), exclusively for the operating expenses of the commission and the division.
N.J.S.A. § 5:12–143.

13. *See* N.J.S.A. §§ 5:12–111—5:12–117 and 5:12–130.

ment of Treasury, called the "Casino Revenue Fund." N.J.S.A. § 5:12–145.[14] Pursuant to N.J.S.A. § 5:12–145, the first $600,000 of funds collected each year through the imposition of fines and penalties is paid into the General Fund for appropriation by the Legislature to the Department of Health, and used to fund the Council on Compulsive Gambling of New Jersey and various treatment programs. *Id.* All remaining funds are used to reduce property taxes, telephone and electric bills, and municipal utility charges for senior citizens and disabled residents of New Jersey. *Id.*

In sum, the CCC is statutorily authorized to collect two types of revenue: licensing fees, which are deposited into the Casino Control Fund and used for the CCC's operating expenses, and fines, which are deposited into the Casino Revenue Fund and used to finance gambling treatment programs and programs for the disabled and elderly. The CCC's operating budget is funded exclusively by monies collected from the first source. The CCC has no control over funds collected from the second source, fines, as this revenue is allocated to the Department of Health to fund compulsive gambling programs and support programs for senior citizens and the disabled. Significantly, the CCC receives no funding from the State of New Jersey.

In comparison, the funding structure of the CCC is quite different from that of the

---

**14.** This section provides, in relevant part, as follows:

a. There is hereby created and established in the Department of the Treasury a separate special account to be known as the "Casino Revenue Fund," into which shall be deposited all revenues from the tax imposed by section 144 of this act; the investment alternative tax imposed by section 3 of P.L.1984, c. 218 (C. 5:12–144.1); and all penalties levied and collected by the commission pursuant to P.L.1977, c. 110 (C. 5:12–1 et seq.) and the regulations promulgated thereunder, except that the first $600,000 in penalties collected each fiscal year shall be paid into the General Fund for appropriation by the Legislature to the Department of Health, $500,000 of which is to provide funds to the Council on Compulsive Gambling of New Jersey and $100,000 of which is to provide funds for compulsive gambling treatment programs in the State. In the event that less than $600,000 in penalties are collected, the Department of Health shall determine the allocation of funds between the Council and the treatment programs eligible under the criteria developed pursuant to section 2 of P.L.1993, c. 229 (C. 26:2–169).

b. The commission shall require at least monthly deposits by the licensee of the tax established pursuant to subsection a. of section 144 of P.L.1977, c. 110 (C. 5:12–144), at such times, under such conditions, and in such depositories as shall be prescribed by the State Treasurer. The deposits shall be deposited to the credit of the Casino Revenue Fund. The commission may require a monthly report and reconciliation statement to be filed with it on or before the 10th day of each month, with respect to gross revenues and deposits received and made, respectively, during the preceding month.

c. Moneys in the Casino Revenue Fund shall be appropriated exclusively for reductions in property taxes, rentals, telephone, gas, electric, and municipal utilities charges of eligible senior citizens and disabled residents of the State, and for additional or expanded health services or benefits or transportation services or benefits to eligible senior citizens and disabled residents, as shall be provided by law. On or about March 15 and September 15 of each year, the State Treasurer shall publish in at least 10 newspapers circulating generally in the State a report accounting for the total revenues received in the Casino Revenue Fund and the specific amounts of money appropriated therefrom for specific expenditures during the preceding six months ending December 31 and June 30.

N.J.S.A. § 5:12–145.

two entities considered in the governing cases on the availability of Eleventh Amendment immunity to entities claiming they are alter egos of the state, *Fitchik v. New Jersey Transit Rail Operations, Inc.,* 873 F.2d at 655, and *Fuchilla v. Layman,* 109 N.J. 319, 537 A.2d 652 (1988), *cert. denied,* 488 U.S. 826, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988). Both entities received some funding from the State. *Fitchik,* 873 F.2d at 660; *Fuchilla,* 109 N.J. at 327, 537 A.2d 652. *Fitchik* involved a suit against brought against New Jersey Transit ("NJT") by a number of NJT employees, railroad workers, who were injured on the job; the NJT claimed it was an arm of the State and therefore entitled to Eleventh Amendment immunity. The Third Circuit considered a variety of factors when evaluating the funding prong, noting that the majority of NJT's revenue came from private sources, such as ticket sales, which could be raised, and that it was self-insured and its insurance would cover damages such as those alleged by its employees. Ultimately, the Court concluded that the funding factor "weigh[ed] strongly against NJT's claim that it is entitled to immunity from suit in federal court." *Fitchik,* 873 F.2d at 662. *Fuchilla* involved a sexual harassment suit brought against the University of Medicine and Dentistry of New Jersey ("UMDNJ") by a former UMDNJ employee. The New Jersey Supreme Court, noting that a substantial portion of UMDNJ's budget derived from tuition and other funds collected from private sources, concluded that the UMDNJ was not entitled to Eleventh Amendment immunity. *Fuchilla,* 109 N.J. at 327, 537 A.2d 652. Thus, in both *Fitchik* and *Fuchilla,* the fact that the entity claiming alter ego status was funded in part by private sources, and that therefore a judgment against the entity would not necessarily be paid out of the State treasury, was determinative of the entity's ina-

bility to assert Eleventh Amendment immunity.

The only other agencies identified by either of the parties as having a funding structure similar to that of the CCC are the Division of Gaming Enforcement, a sister agency of the CCC which is a division of the Department of Law and Public Safety, *see* N.J.S.A. § 5:12–143b (allocating funding for the Division of Gaming Enforcement) and N.J.S.A. § 5:12–76 *et seq.* (establishing the Division of Gaming Enforcement and enumerating its general duties and powers), and the Board of Public Utilities, *see* N.J.S.A. 48:2–56 *et seq.* This Court has found no published opinion addressing the applicability of the Eleventh Amendment to either the Division of Gaming Enforcement or the Board of Public Utilities.

Based on the funding structure of the CCC outlined above, Tropicana argues that there is no evidence that any judgment against the CCC would be paid out of the State treasury. Pursuant to the holdings in *Fitchik* and *Fuchilla,* then, Tropicana asserts that the funding prong of the *Fitchik* inquiry weighs against the CCC's ability to assert Eleventh Amendment immunity.

The CCC contends that its funding structure is unique, and therefore it cannot be compared to either the NJT's funding structure (*Fitchik*), or the UMDNJ's funding structure (*Fuchilla*). Additionally, the CCC argues that, based upon the New Jersey Superior Court, Appellate Division's decision in *Atlantic City Casino Hotel Assoc.,* 203 N.J.Super. at 234, 496 A.2d 714, the CCC has no authority to raise revenue in excess of that required to cover its actual expenditures for operating expenses, and that therefore the CCC cannot be liable for an award of damages against it.

Based on my review of the record and applicable statutory and case law, I con-

clude that the CCC's entitlement to Eleventh Amendment immunity under the funding factor of the *Fitchik* analysis is at best ambiguous. The fact that the CCC is funded entirely through fees it collects from the private industry which it regulates, and not from the State, weighs against Eleventh Amendment immunity. Yet, given the Appellate Division's limited construction of the CCC's statutorily defined revenue-raising capacity in *Atlantic City Casino Hotel Assoc.*, the CCC undisputedly has significantly less discretion, if any, to raise revenue in order to satisfy a judgment, than did the entities considered in *Fitchik* and *Fuchilla*. While the funding factor has been called "the most important" of the three *Fitchik* factors, the court's determination of an entity's status as an alter-ego of the state and entitlement to Eleventh Amendment immunity must be made as a result of the balancing of all three *Fitchik* factors. Accordingly, I shall proceed to consider the two remaining *Fitchik* factors, namely, the status of the entity under state law, and the degree of the CCC's autonomy from the State.

## 2. Status of the Casino Control Commission under New Jersey Law

■ Application of this prong of *Fitchik* requires an examination of whether under New Jersey state law, the NJCCC is considered the equivalent of the State of New Jersey itself. The Third Circuit has explained that this prong "includes four factors-how state law treats the agency generally, whether the entity is separately incorporated, whether the agency can sue or be sued in its own right, and whether it is immune from state taxation." *Fitchik*, 873 F.2d at 659.

A consideration of each of these factors reveals that New Jersey law clearly considers the CCC to be an arm of the state. It is undisputed that the CCC is not separately incorporated, as are, for example, both NJT, *see Fitchik*, 873 F.2d at 663, and UMDNJ, *see Fuchilla*, 537 A.2d at 657. The CCC has the power to sue for the recovery of unpaid fees, interest, penalties or taxes, but does so in the name of the State of New Jersey. *See* N.J.S.A. § 5:12–68.[15] The CCC and the State are immunized from suit for damages resulting from disclosure, other than willfully unlawful disclosure, of information acquired through the casino license application process. *See* N.J.S.A. § 5:12–80.[16] Finally, the CCC pays no taxes.

The only factor identified by Tropicana in support of its contention that the CCC's

15. This statute provides, in relevant part, as follows:

At any time within five years after any amount of fees, interest, penalties or tax required to be collected pursuant to the provisions of this act shall become due and payable, the commission may bring a civil action in the courts of this State or any other state or of the United States, in the name of the State of New Jersey, to collect the amount delinquent, together with penalties and interest. An action may be brought whether or not the person owing the amount is at such time an applicant, licensee or registrant pursuant to the provisions of this act. If such action is brought in this State, a writ of attachment may be issued and no bond or affidavit prior to the issu-ance thereof shall be required. In all actions in this State, the records of the commission shall be prima facie evidence of the determination of the fee or tax or the amount of the delinquency.
N.J.S.A. 5:12–68.

16. This section provides, in relevant part, as follows:

All applicants, registrants, and licensees shall waive liability as to the State of New Jersey, and its instrumentalities and agents, for any damages resulting from any disclosure or publication in any manner, other than a willfully unlawful disclosure or publication, of any material or information acquired during inquiries, investigations or hearings.

status under state law is "ambiguous" is that the CCC has the authority to employ its own counsel. *See* N.J.S.A. § 5:12–54d. The fact that the UMDNJ also had the authority to employ its own counsel was considered by the New Jersey Supreme Court in *Fuchilla.* Yet the *Fuchilla* court considered this issue only as part of the larger question of whether the UMDNJ had the power to sued and be sued. *Fuchilla,* 109 N.J. at 329–330, 537 A.2d 652. Furthermore, the fact that the UMDNJ had the authority to retain independent counsel was not dispositive-the Court held that the UMDNJ's status under this factor was "inconclusive." *Id.* at 330, 537 A.2d 652. Finally, while the CCC has the authority to retain independent counsel, the New Jersey Attorney General has on occasion represented the CCC. *See, e.g., Schurr v. Resorts Int'l Hotel,* 16 F.Supp.2d 537 (D.N.J.1998), *rev'd,* 196 F.3d 486 (3d Cir.1999). Accordingly, I conclude that the fact that the CCC has the authority to retain independent counsel does not negate its status, under state law, as an arm of the State.

In sum, the second prong of the *Fitchik* analysis, involving the entity's status under state law, clearly weighs in favor of considering the CCC an alter ego of the State and according it Eleventh Amendment immunity. Because the CCC's status under state law is readily discernable, the analysis of this factor may be significant in determining the entity's entitlement to Eleventh Amendment immunity. *Cf. Fitchik,* 873 F.2d at 662 (stating that "[b]ecause NJT's status under New Jersey law is uncertain, the analysis of this factor does not significantly help in determining whether NJT is entitled to immunity from suit in federal court"). I conclude that this prong of the *Fitchik* analysis weighs

N.J.S.A. § 5:12–80(b).

strongly in favor of granting the CCC Eleventh Amendment immunity.

### 3. Autonomy

The final factor of the *Fitchik* analysis inquires as to the entity's independence from the State. To assess NJT's autonomy in *Fitchik,* the Third Circuit considered, *inter alia,* the degree of independence enjoyed by the NJT's board of directors, the membership of the board of directors, the NJT's ability to enter contracts, file lawsuits, purchase and sell property, purchase insurance, structure management, and set and collect fares. *Fitchik,* 873 F.2d at 663–64. Similarly, the New Jersey Supreme Court in *Fuchilla* considered UMDNJ's power to contract, to acquire property, and to borrow money without obligating the state, as well as a legislative amendment that declared "it to be the public policy of the State that the university shall be given a high degree of self-government." *Fuchilla,* 109 N.J. at 329, 537 A.2d 652.

Examining the powers of the CCC in light of these considerations, this Court concludes that the CCC has minimal autonomy from the State on the basis of the factors identified above. Appointments to the CCC are made by the Governor of the State with the advice and consent of the Senate. N.J.S.A. § 5:12–52. Unlike the entities considered in *Fitchik* and *Fuchilla,* the CCC does not have general authority to contract, *see* N.J.S.A. §§ 18A:64G–6(*l*) (UMDNJ) and 27:25–5(v)(NJT), nor does it have the power to acquire or dispose of real property, *see* N.J.S.A. §§ 18A:64G–6(n)1 (UMDNJ) and 27:25–5(j)(NJT). The State has not explicitly disclaimed its responsibility for the liabilities of the CCC, as it did for the UMDNJ, N.J.S.A. § 18A:64G–15, and the NJT,

N.J.S.A. § 27:25–17. The CCC does have the authority to structure its internal organization and to contract the employment of "such other personnel as it deems necessary," *see* N.J.S.A. § 5:12–54(a) and (d); however, the duties of the chairman, vice-chairman, and executive secretary are established by statute. N.J.S.A. § 5:12–54(b)(d). Because the CCC's powers are limited in comparison with the powers enumerated by the *Fitchik* and *Fuchilla* courts as relevant to a determination of the entity's autonomy under the third prong of Fitchik analysis, I conclude that the autonomy factor strongly weighs in favor of considering the CCC an arm of the State for purposes of Eleventh Amendment immunity.

### 4. Balancing the *Fitchik* Factors

 Having considered the application of each of the three factors of the *Fitchik* analysis to the CCC, this Court must now balance these factors to determine whether the CCC is properly considered an alter ego of the State and therefore entitled to Eleventh Amendment immunity. *See Fitchik*, 873 F.2d at 664. With respect to the first and "most important" factor, funding, I concluded above that the CCC's status is ambiguous. While it is not funded by the State treasury, its revenue sources are tightly controlled by statute and it may be limited, under State law, from increasing fees or otherwise raising revenue to satisfy an award of damages. Furthermore, the State has not specifically disavowed liability in the case of a damages award against the CCC, as it did for the entities considered in *Fitchik* and *Fuchilla*. With respect to the second factor, status under state law, I concluded that the CCC is clearly considered an arm of the State under the law of New Jersey. The CCC is not separately incorporated, its powers to sue and be sued are limited and what suits are brought are brought in the name of the State of New Jersey, and it is immune from state taxation. Finally, with respect to the third *Fitchik* factor, autonomy, I concluded above that the CCC's powers are limited when assessed against the powers considered relevant by the courts in *Fuchilla* and *Fitchik*, insofar as the CCC's members are appointed by the Governor and their duties established by statute, and the CCC cannot purchase real property and does not have general power to contract.

On balance, I conclude that the CCC is an *alter ego* of the State of New Jersey and is therefore entitled to Eleventh Amendment immunity. While the funding factor is the most important factor to be considered, the application of the governing case law, *Fitchik* and *Fuchilla*, to the CCC is difficult to determine, because the CCC's funding structure is unique. Because the two other factors, status under state law and autonomy, clearly weigh in favor of treating the CCC an arm of the state, I conclude that, on balance, these two factors outweigh the ambiguity of the funding factor in favor of Eleventh Amendment immunity. Accordingly, I shall grant Commissioner Hurley's motion to dismiss Tropicana's and the Plaintiff's claims against him, in his official capacity as Commissioner of the CCC, for damages, pursuant to the Eleventh Amendment.

## VII. CONCLUSION

I shall grant the State Defendants' unopposed motion to dismiss all claims against the State of New Jersey on the grounds of Eleventh Amendment immunity. Additionally, for the reasons set forth above, I shall grant the State Defendants' motion to dismiss, for failure to state a claim upon which relief may be granted, Tropicana's claims for contribution, indemnification, or statutory entitlement pursuant to 42 U.S.C. § 1988, for Plaintiff's

attorneys' fees which may be assessed against Tropicana if Plaintiff prevails against Tropicana in the underlying litigation. Furthermore, I shall grant the State Defendants' motion to dismiss, for lack of subject matter jurisdiction based on Eleventh Amendment immunity, Plaintiff's and Tropicana's claims against the State Defendants for damages under the NJLAD.

With respect to Commissioner Hurley, I shall grant his motion to dismiss the claims against him, with the exception of the claims for prospective, injunctive relief under federal law, because I conclude that the CCC is an arm of the State of New Jersey and is therefore entitled to Eleventh Amendment immunity.

## ORDER

This matter having come before the Court on the motion of Third–Party Defendants, the State of New Jersey, Donald T. DiFrancesco, the Acting Governor of New Jersey, and John J. Farmer, Jr., Esq., Attorney General of New Jersey(together, "State Defendants"), to dismiss portions of the Plaintiff's Rule 14(a) Complaint and portions of the Defendant/Third–Party Plaintiff's Complaint, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), John J. Farmer, Esq., Attorney General and Mark T. Holmes, Esq., Deputy Attorney General, appearing for the State Defendants, and the motion of Third–Party Defendant, James R. Hurley, Commissioner, New Jersey Casino Control Commission, to dismiss portions of Plaintiff's Rule 14(a) Complaint and Defendant/Third–Party Plaintiff's Complaint, pursuant to Federal Rule of Civil Procedure 12(b)(1), John R. Zimmerman, Esq. and David C. Missimir, Esq., appearing on behalf of Commissioner Hurley, Louis R. Moffa, Esq. and Jerry L. Tanenbaum, Esq., Schnader Harrison Segal & Lewis LLP, appearing on behalf of Defendant/Third–Party Plaintiff, Adamar of New Jersey, Inc., d/b/a/ Tropicana, and Stephen G. Console, Esq. and Deborah Hart Simon, Esq., appearing on behalf of Plaintiff, John D. Rudolph; and,

The Court having considered the papers submitted in support of the application by counsel for the State Defendants and counsel for Commissioner Hurley, and the papers submitted in opposition by counsel for Third–Party Plaintiff, Tropicana and counsel for Plaintiff, Rudolph;

For the reasons set forth opinion filed today, IT IS, on this 31st of July, 2001, hereby ORDERED that:

1. The State Defendants' motion to dismiss all claims brought by Plaintiff, Rudolph, and Defendant/Third–Party Plaintiff, Tropicana, against the State of New Jersey is GRANTED; and,

2. The State Defendants' motion to dismiss Tropicana's claim for contribution, indemnification, and/or statutory relief pursuant to 42 U.S.C. § 1988, for any attorneys' fees Plaintiff is awarded against Tropicana, is GRANTED; and,

3. The State Defendants' motion to dismiss all claims brought by Tropicana and Rudolph for damages based on alleged violations of the New Jersey Law Against Discrimination, N.J.S.A. § 10:5–1. *et seq.*, is GRANTED; and,

4. Commissioner Hurley's motion to dismiss all claims brought against him in his official capacity as Commissioner of the New Jersey Casino Control Commission, except claims for prospective, injunctive relief, is GRANTED.